**HARPER & ROW, PUBLISHERS, INC. and the Reader's Digest Association, Inc., Plaintiffs,**

**v.**

**NATION ENTERPRISES and the Nation Associates, Inc., Defendants.**

**No. 80 Civ. 856.**

United States District Court, S. D. New York.

Oct. 21, 1980.

Roger L. Zissu, Cowan, Liebowitz & Latman, P. C., New York City, Edward A. Miller, New York City, for plaintiffs.

Floyd Abrams, Andrew L. Deutsch, Cahill, Gordon & Reindel, New York City, Bruce J. Ennis, American Civil Liberties Union, New York City, for defendants; Leon Friedman, Hempstead, N. Y., of counsel.

## MEMORANDUM AND ORDER

OWEN, District Judge.

In this action under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), the defendants Nation Enterprises and The Nation Associates, Inc. (hereinafter collectively referred to as "The Nation") have moved to dismiss plaintiffs' pendant state law claims of conversion (Second Count) and tortious interference with contract (Third Count).[1]

The central allegations of the amended complaint may be summarized as follows. In February 1977, plaintiffs Harper & Row, Publishers, Inc. ("Harper & Row") and The Reader's Digest Association, Inc. ("Reader's Digest") entered into an agreement with former President Gerald Ford to publish his memoirs. The memoirs were to discuss Mr. Ford's actions and personal reflections on his experiences as Vice President and President of the United States, focusing in particular on the resignation and pardon of former President Richard M. Nixon. Under the terms of their contract, Mr. Ford granted plaintiffs the exclusive rights to publish his memoirs in book form and to sell pre-book publication rights to newspapers and periodicals.

In March 1979, after Mr. Ford produced a typescript of the memoirs, plaintiffs entered into an exclusive agreement with Time, Inc. to publish selected portions of the memoirs dealing with the Nixon resignation and Mr. Ford's early days as President in advance of plaintiffs' release of the complete memoirs in book form.[2] Time, Inc. was "licensed to publish" excerpts only in its April 23, 1979 issue to be on sale April 16, 1979. Plaintiffs agreed not to authorize publication of any portion of the manuscript in the United States or Canada prior to April 23, 1979. In addition, the contract provided for renegotiation of a $12,500 payment in the event that any of the material was published before the Time article was released.

To the plaintiffs' surprise, however, in the April 7, 1979 issue of The Nation there appeared an article entitled, "The Ford Memoirs, Behind the Pardon" ("The Nation article"). Plaintiffs allege that The Nation article, which focuses specifically on Mr. Ford's account of the Nixon pardon, was prepared from a copy of the unpublished manuscript of Mr. Ford's memoirs which defendants somehow obtained and used without plaintiffs' authorization.[3] Plaintiffs further contend that as a result of The Nation article, Time, Inc. cancelled its proposed publication of selections from the memoirs, and refused, under the renegotiation clause of its contract with plaintiffs, to

---

1. Plaintiffs voluntarily dropped an additional common law claim of "misappropriation" by amending their complaint.

2. Plaintiffs planned to release the hardcover book edition of the Ford manuscript entitled, "*A Time to Heal*" to bookstores on or after April 25, 1979. Amended Complaint ¶ 13.

3. The Nation article states that the magazine obtained the transcript of Mr. Ford's memoirs before publication. Amended Complaint, Exhibit A.

pay the $12,500 which would otherwise have been due.[4]

The amended complaint pleads three causes of action arising out of the facts described above: copyright infringement (First Count),[5] conversion (Second Count), and interference with contract (Third Count). Defendants have moved to dismiss the Second and Third Counts on the grounds, *inter alia*, that these state law claims are expressly preempted by the federal copyright law.[6] Section 301 of the Copyright Act, 17 U.S.C. § 301 ("§ 301") provides the statutory basis for preemption. That section states, in pertinent part:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

    \*     \*     \*     \*     \*     \*

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106.

Congress clearly indicated that "[t]he intention of Section 301 is to preempt and abolish any rights under the common law or statutes of a state that are equivalent to copyright and that extend to works within the scope of the Federal copyright law." H.R.Rep.No.94-1476, 94th Cong., 2d Sess. at 130 (1976) (hereinafter "House Report."), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5746. Consistent with this purpose, the statute establishes a two-pronged test for preemption focusing on the nature of the work in question and the rights claimed in that work under state law. *Cf.* 1 *Nimmer on Copyright*, § 101(B) at 1-9. First, the nature of the "work of authorship in which rights are claimed," i. e., the manuscript of the Ford memoirs, must come within the "subject matter of copyright" as defined in Sections 102 and 103 of the Copyright Act. Second, the rights granted under state law, i. e., the common law torts of conversion and interference with contract, must be "equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 [of the Copyright Act] . . . ."

    ■ In this case, the preemption analysis begins with the question of whether the unpublished manuscript of Mr. Ford's memoirs falls within the definition of copyrightable works under §§ 102 or 103 of the Copyright Act. Section 102 provides in relevant part:

(a) Copyright protection subsists, in accordance with this title, in original works

---

**4.** Plaintiffs, as copublishers, also claim to have had a second contract with Reader's Digest, as licensee, to publish excerpts from the manuscript in its May 1979 issue, to be on sale April 24, 1979. Amended Complaint ‘ 13. There is no allegation, however, that that contract was cancelled or any payment under it withheld as a result of The Nation article. It is unclear, therefore, how plaintiffs were damaged by conversion or tortious interference with contract with respect to the licensing agreement with Reader's Digest.

**5.** Plaintiffs allege that they obtained copyright registration for the Ford manuscript on August 24, 1979, and that they duly recorded the instruments of transfer with respect to the rights covered by their agreement with Mr. Ford and Reader's Digest, as licensee.

**6.** Article VI, clause 2, provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S.Const. Art. VI, cl. 2.

of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works; . . . .

The unpublished manuscript of the Ford memoirs, as described in the amended complaint and not disputed by defendants, is an autobiographical work comprised of a recitation, through Mr. Ford's eyes and in his own words, of events in the former President's public and private life. As such, it is an "original work of authorship fixed in tangible form" or a "literary work" of non-fiction. The fact that, as defendants suggest, much or some of its contents may be categorized as "news events," see *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, n.3 (S.D.N.Y.1968), or matters within the public domain, see *R. Dakin & Co. v. A & L Novelty Co., Inc.*, 444 F.Supp. 1080 (E.D.N.Y.1978), not entitled to copyright protection, does not necessarily negate its originality.[7] As the Second Circuit recently explained:

> [I]n considering the copyright protections due a report of news events or factual developments, it is important to differentiate between the substance of the information contained in the report, *i. e.*, the event itself, and "the particular form of collocation of words in which the writer has communicated it." *International News Service v. Associated Press*, 248 U.S. 215, 234, 39 S.Ct. 68, 70, 63 L.Ed. 211 (1918); *see Chicago Record–Herald Co. v. Tribune Ass'n*, 275 F. 797 (7th Cir. 1921). What is protected is the manner of ex-

pression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments.

*Wainright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95–96 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). Furthermore, for purposes of preemption under § 301, it is not necessary to establish that the work has sufficient originality to qualify for copyright protection under § 102. It is sufficient if the work falls within the general category of works which may qualify for copyright protection, e. g., a literary work as opposed to facts constituting "hot news." *See International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). As Congress has stated:

> As long as a work fits within one of the general subject matter categories of section 102 and 103 [sections 102 and 103 of this title], the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into public domain.

House Report at 131, U.S.Code Cong. & Admin.News 1976, p. 5747. It is evident from the foregoing analysis that the Ford memoirs fall within the subject matter of the Copyright Act.

■ The question remains, however, whether the rights which plaintiffs seek to protect under state law are equivalent to the rights enumerated in § 106 of the Copyright Act. That section [8] identifies the gen-

---

7. Congress identified "originality and fixation in a tangible form" as the "two fundamental criteria of copyright protection" under § 102 of the Copyright Act.

8. Section 106 provides in pertinent part:
106. Exclusive rights in copyrighted works
Subject to sections 107 through 118, the owner of copyright under this title has the following exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies of phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

eral nature of the rights which fall "within the general scope of copyright:" the right to exclusive reproduction, performance, distribution, or display of copyrightable work whether in original or derivative form.[9] See 1 Nimmer on Copyright § 101[B][1] at 1–10, 1–11. In assessing whether a cause of action under state law is "equivalent" to a claim of copyright infringement, the court must compare the rights sought to be protected under the federal and state laws. The fact that the state cause of action is composed of fewer elements of proof than a copyright infringement claim is not in itself dispositive. The state cause of action must protect rights under the facts of a particular case which are qualitatively different from the rights of reproduction, performance, distribution, or display. Thus, as Congress stated:

> The evolving common law rights of "privacy," "publicity," and trade secrets, and the general law of defamation and fraud, would remain unaffected as long as the causes of action contain elements, such as an invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement.

House Report at 132, U.S.Code Cong. & Admin.News 1976, p. 5748 (emphasis added). While § 301 does not expressly preempt any particular state law claim protecting rights in copyrightable material including conversion and interference with contract, preemption is required when the state law rights asserted are not "different in kind" from those rights protected under the Copyright Act.

█ The essence of plaintiffs' conversion claim (Count Two) [10] is that defendants somehow obtained a copy of the unpublished manuscript of Mr. Ford's memoirs and copied portions of it. According to plaintiffs, defendants allegedly used the text of the Ford work, either by direct quotations or paraphrases, in preparing The Nation article. Plaintiffs further claim that the unauthorized use of the Ford memoirs deprived plaintiffs of the profits from its contract with Time, Inc. under which plaintiffs exercised their exclusive right to authorize or prohibit copying and publication of the content of the Ford memoirs. Thus, it is clear that the right for which plaintiffs claim protection in Count Two is not the right to physical possession of the original typescript of the unpublished manuscript of Mr. Ford's memoirs. Cf. Pearson v. Dodd, 410 F.2d 701, 707–708 (D.C.Cir. 1968), cert. denied, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). Instead, by this conversion claim, plaintiffs seek to vindicate rights which are equivalent to the rights protected under the copyright laws, i. e., the exclusive right to reproduce and distribute a copyrightable work.[11] The conversion claim is, therefore, preempted by the Copyright Act pursuant to § 301.

Count Three for tortious interference with contract is based on the same factual allegations as Counts One and Two with two additional elements.[12] In Count Three,

pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

9. Reproduction and distribution in this context include copying and publication. See 17 U.S.C. § 101.

10. To state a claim for conversion a plaintiff must allege that he has property rights in a specific, tangible item and that the defendant has exercised dominion and control over that item to the exclusion of plaintiffs' exercise of his rights in the property. Kaufman v. Simons Motor Sales Co., 261 N.Y. 146, 149, 184 N.E. 739, 740 (1933); Employers' Fire Insurance Co. v. Cotten, 245 N.Y. 102, 105, 156 N.E. 629, 630 (1927); AMF Inc. v. Algo Distributors, Ltd., 48 App.Div.2d 352, 356, 369 N.Y.S.2d 460, 464 (2d

Dep't 1975); Bunge Corp. v. Manufacturers Hanover Trust Co., 37 App.Div.2d 409, 414, 325 N.Y.S.2d 983, 988 (1st Dept. 1971), aff'd 31 N.Y.2d 223, 286 N.E.2d 903, 335 N.Y.S.2d 412 (1972). See also W. Prosser, The Law of Torts § 15 (4th ed. 1971); 1 F. Harper and F. James, The Law of Torts § 2.2 (1956).

11. The exclusive rights of reproduction and distribution are expressly asserted in plaintiffs' copyright infringement claim. Amended Complaint ¶¶ 24, 25.

12. To be liable for interference with contractual relations, one must be aware of the existence of the contract, Roulette Records, Inc. v. Princess Promotion Corp., 15 App.Div.2d 335, 224 N.Y.S.2d 204 (1st Dept.), aff'd 12 N.Y.2d 815, 236 N.Y.S.2d 65, 187 N.E.2d 132 (1962), and addi-

plaintiffs have also alleged that defendants were aware of plaintiffs' contract with Time, Inc., and intentionally interfered with that contract when they published The Nation article. The contractual right sought to be protected is closely analogous to the exclusive rights granted copyright holders under § 106 of the Copyright Act. It is the right to "prepare derivative works based upon the copyrighted work," [13] and "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership." [14] Moreover, the fact that plaintiffs' claim of interference with contract contains the additional elements of awareness and intentional interference with contract not pleaded in the First Count, undoubtedly because these elements are not required under the copyright laws, does not automatically preclude a finding of preemption. Rather, the House Report strongly

supports the conclusion that the Copyright Act preempts a common law claim for interference with a contractual relationship:

> Nothing in the bill derogates from the rights of parties to contract with each other and to sue for breaches of contract; however, to the extent that the unfair competition concept known as "interference with contract relations" is merely the equivalent of copyright protection, it would be preempted.

House Report at 132, U.S.Code Cong. & Admin.News 1976, p. 5748. Furthermore, in that the copyright laws protect against innocent as well as intentional infringements, and the measure of recovery under the Copyright Act would be the same as that applicable under state tort law,[15] the Copyright Act provides equivalent rights and remedies to those available under state law.[16] In other words, the contract claim is

---

tionally must know or be substantially certain that one's acts will cause a breach of contract or diminution in the value of contractual rights, Restatement (Second) of Torts § 766, comment (1979). Malice–the intent to injure the plaintiff–is not a requirement of the tort. *Campbell v. Gates,* 236 N.Y. 457, 460, 141 N.E. 914, 915 (1923).

**13.** A "derivative work" is defined in the Act as "a work based upon one or more preexisting works, such as a[n] . . . abridgment [or] condensation . . . ." 17 U.S.C. § 101.

**14.** These rights are also alleged to have been infringed in Count One. It should also be noted that plaintiffs' contractual transfer of part of their rights to Time, Inc. (and, indeed, plaintiffs' original acquisition of the rights from the author) was made pursuant to Section 201(d)(2) of the Act, which provides, in relevant part:

> Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by Section 106, may be transferred . . . . and owned separately.

**15.** The measure of recovery for the defendants' allegedly wrongful acts is equivalent under the Copyright Act to that permitted by state tort law. Under the Copyright Act, a copyright owner may recover in an infringement action: "[t]he actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

Because copyright infringement is "in the nature of a tort," *Screen Gems–Columbia Music, Inc. v. Metlis & Lebow Corp.,* 453 F.2d 552, 554 (2d Cir. 1972); "actual damages" is given the same meaning as with other torts, *Aladdin Mfg. Co. v. Mantle Lamp Co. of America,* 116 F.2d 708, 716 (7th Cir. 1941) ["actual damages" under Trademark Act]. Thus, damage to contractual relations caused by a tort, measured by the lost profits that would have accrued to plaintiffs, are recoverable in tort actions, *Sperry Rand Corp. v. A–T–O, Inc.,* 447 F.2d 1387, 1394 n.4 (4th Cir. 1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972). Lost profits are available as a measure of actual damages both in copyright infringement cases and in interference with contract cases. *Compare* 3 *Nimmer on Copyright* § 14.02 at 14–7 (1979) with *Lurie v. New Amsterdam Casualty Co.,* 70 N.Y. 379, 382, 1 N.E.2d 472, 473 (1936) [attorney's damages for inducement by insurance company of breach of retainer agreement by client is contractually agreed contingent percentage of client's eventual recovery]; *Simon v. Royal Business Funds Corp.,* 34 App. Div.2d 758, 760, 310 N.Y.S.2d 409, 411 (1st Dept. 1970), *aff'd* 29 N.Y.2d 692, 275 N.E.2d 21, 325 N.Y.S.2d 649 (1971); *Anthony v. George T. Bye, Inc.,* 243 App.Div. 390, 277 N.Y.S. 222 (1st Dept. 1935) [damages are limited to full payment for services performed by plaintiff under contract and are not recoverable if he has been paid]; Restatement (Second) of Torts, § 766, comment t (1979).

**16.** Insofar as plaintiff seeks to recover damages as a result of the cancellation of the Time contract, § 504 of the Copyright Act provides plaintiff with a remedy. *See* note 15, *supra.*

redundant because the additional elements of "knowledge" and "intent" required under state law do not afford plaintiff rights that are "different in kind" from those protected by the copyright laws. *See* House Report at 132, U.S.Code Cong. & Admin.News 1976, p. 5748. Thus, the Third Count is also preempted under § 301.

In sum, the Second and Third Counts of the amended complaint are preempted by § 301 of the Copyright Act. Accordingly, defendants motion to dismiss Counts Two and Three is granted.

So ordered.