[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 09-11160, 09-11447,
09-12887

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 19, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-60654-CV-WJZ

UTOPIA PROVIDER SYSTEMS, INC.,
a.k.a. Utopia Providers Systems, Inc.,

Plaintiff-Counter-
Defendant-Appellant,

JOSHUA PLUMMER, et al.,

Plaintiffs,

versus

PRO-MED CLINICAL SYSTEMS, L.L.C.,

Defendant-Counter-
Claimant-Appellee,

THOMAS L. GROSSJUNG,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 19, 2010)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,[*] District Judge.

TJOFLAT, Circuit Judge:

The dispute in this case arises from Pro-Med Clinical Systems, LLC's ("Pro-Med") use of Pro-Med Maximus, paper templates designed to capture a physician-patient encounter, and the electronic version of that product developed by Pro-Med. Utopia Provider Systems, Inc. ("Utopia") alleges that both products are derivatives of its paper templates, ED Maximus.[1] Pursuant to an agreement in effect between October 1, 2001, and October 1, 2006 (the "License Agreement" or "Agreement"), Utopia licensed ED Maximus to Pro-Med and Pro-Med was obligated to pay Utopia royalties if any portion of ED Maximus was provided to an end user. In 2003, Utopia obtained a copyright for ED Maximus, effective as of October 29, 2001.

Contending that Pro-Med committed unauthorized use of ED Maximus and failed to pay royalties that it owed Utopia, Utopia brought this action against Pro-Med alleging claims of copyright infringement, breach of fiduciary duties, and

_____

[*] Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[1] Throughout this opinion, "ED Maximus" refers to the product Utopia created, which it claims is copyrightable, while "Pro-Med Maximus" refers to the product sold by Pro-Med. The products are identical except in name.

breach of contract. The district court granted Pro-Med summary judgment on Utopia's copyright infringement claim on the ground that ED Maximus was not copyrightable, and declined to exercise supplemental jurisdiction over Utopia's breach of fiduciary duty and breach of contract claims that were based on state law,[2] dismissing them without prejudice.[3]

Utopia appeals, arguing that the district court erred in finding that it did not hold a valid copyright in ED Maximus and abused its discretion in declining to exercise supplemental jurisdiction over the state law claims. Pro-Med cross-appeals the dismissal of some of Utopia's breach of contract claims, contending that the district court should have found them preempted by federal copyright law. We affirm.

I.

A.

In August 2001, Dr. Michael S. McHale, an "emergency physician," and Joshua Plummer, a "healthcare administrator," created a prototype template from which they would develop "ED Maximus," a system of templates for use in

---

[2] The district court had original subject matter jurisdiction over the copyright claim under 28 U.S.C. § 1338(a) and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

[3] The court dismissed those state law claims before it granted Pro-Med summary judgment. The ruling is challenged in Utopia's appeal and Pro-Med's cross-appeal.

hospital emergency departments.[4]  McHale and Plummer sought to license ED Maximus to Pro-Med, a marketing agent, which would sell the template to hospitals.  On August 23, McHale and Plummer formed Utopia to own and manage the rights in ED Maximus.

In September 2001, Utopia and Pro-Med entered into the License Agreement, effective October 1, 2001.  Pursuant to this Agreement, Utopia granted Pro-Med "an exclusive royalty-bearing license to sell, market, service, distribute and otherwise use" its rights associated with the ED Maximus charts (the "Licensed Materials").  Pro-Med would use the Licensed Materials to formulate a product called "Pro-Med Maximus"; Pro-Med Maximus would refer to any software product "which uses or employs a full or partial copy of any Licensed Material."  Such a product could include "the printing and manual completion of Charts, as well as the creation of an electronic medical record based on or derived from the Charts."

The Agreement specified that Pro-Med would owe Utopia 50% of the revenue it collected from the "sale, licensing or other distribution of the Pro-Med

---

[4]  The district court sometimes referred to these templates as charts.  We use the words interchangeably.

Maximus Module"[5] in "any form . . . distributed by [Pro-Med] either as a component . . . or on a stand-alone basis."  The License Agreement would remain in effect for five years, unless sooner terminated in accordance with its terms, and would automatically renew for an additional one-year period each year thereafter absent notification of nonrenewal by either party.  Once terminated, Pro-Med had to stop using the Licensed Materials.

In October 2001, McHale and Plummer created 56 ED Maximus templates to "capture a patient encounter."  In the words of the district court,

> [t]he [templates] as a whole act as an integrated system for efficiently documenting a patient's symptoms, and the physician's conclusions and directions to the patient. . . . [Each of the 56 templates consists of] two- or three-page sets of charts, each useful for a particular type of ailment, such as chest pain, burns, head injury, pregnancy related problems, etc.  Other than what necessarily differs chart to chart based on the nature of the ailment addressed, each chart is identical.  They consist of blocks in which to record information from the patient: The top block calls for personal data such as name, date of birth, and chief complaint.  The next block calls for information on the present illness, such as how long it has been present, the quality of the pain, what exacerbates it, what relieves it, etc.  The next block calls for information on the present state of all the patient's body systems.  The next block calls for information about the patient's medical and social history.  The next two blocks, on page two, call for information to be input as part of the actual exam done for the problem presented and the decisions made by the physician.  These blocks change based on the particular illness to be addressed using

---

[5] This provision was subject to a minimum royalty of 25 cents per patient visit unless otherwise agreed to by the parties.

the chart.  The final blocks allow for information to be input for clinical impressions, consultations with other doctors, and discharge instructions.  See generally DE 100, Ex. A-1.  Each of the blocks on the charts contains blanks to be filled in by the physician with the relevant information.  The line item blanks each have a word or two identifying what information should be placed there.

On October 29, 2001, McHale and Plummer submitted the ED Maximus templates to the United States Copyright Office, requesting a Certificate of Registration. McHale and Plummer ultimately received a Certificate of Registration for ED Maximus as a compilation of terms.[6]

In creating Pro-Med Maximus, Pro-Med copied the ED Maximus templates verbatim, changing only the name of the product.  On November 1, 2001, Pro-Med began selling Pro-Med Maximus templates to hospitals throughout the United States.  About a year later, Pro-Med began the development of its Electronic Physician Documentation system ("EPD") based on the Pro-Med (and thus ED) Maximus templates.  Pro-Med copied directly from the Pro-Med Maximus templates to create the first version of EPD, but modified the second version.  Pro-Med began marketing the full version of EPD in September 2003.

In February 2006, Pro-Med reduced the amount of royalties it paid Utopia

---

[6]  In Plummer's first copyright application, he described ED Maximus as a "compilation of works."  The Copyright Office responded that this description was insufficient to obtain a copyright, and Plummer submitted a second application describing the product as a "compilation of terms."  The Copyright Office then issued a Certificate of Registration.

on Pro-Med Maximus from 50% to 30% of its sales. The License Agreement expired on October 1, 2006, after unsuccessful negotiations to extend the Agreement. Pro-Med continued to sell Pro-Med Maximus until mid-June 2007. Pro-Med continues to sell EPD. Pro-Med has never paid Utopia royalties on the sale of EPD.

## B.

The present litigation began in the Circuit Court of Broward County, Florida, on January 17, 2007. Utopia filed suit against Pro-Med for breach of contract, i.e., the License Agreement. After Pro-Med moved the court to dismiss the case on the ground that Utopia's claim arose under copyright law, and thus had to be brought in federal court, Utopia voluntarily dismissed the case without prejudice. On May 8, 2007, Utopia sued Pro-Med in the United States District Court for the Southern District of Florida.[7] Its complaint[8] contained three counts: Count I for copyright infringement; Count II for breach of fiduciary duties; and Count III for breach of contract, the License Agreement.[9] All three counts were

---

[7] McHale and Plummer joined Utopia as plaintiffs. They are no longer in the case.

[8] The complaint referred to in the text and throughout this opinion is Utopia's third amended complaint filed on June 19, 2008.

[9] The complaint named Thomas L. Grossjung, the President of Pro-Med, as a co-defendant with Pro-Med in Counts I and II, but not Count III. For convenience, we refer to the two defendants as Pro-Med.

7

based on Pro-Med's use of Pro-Med Maximus and EPD beyond the period of the License Agreement and Pro-Med's failure to pay royalties.[10]

Pro-Med's answer to the complaint admitted the existence of the License Agreement but challenged its enforceability, denied the complaint's material allegations, and asserted nine affirmative defenses, two of which are relevant here: ED Maximus was not copyrightable because its templates were blank forms that did not convey information, and Utopia's breach of contract claim was preempted by the Copyright Act.

The parties cross-filed motions for summary judgment on Count I.[11]  On September 19, 2008, prior to ruling on these motions, the district court sua sponte dismissed Counts II and III.  The court explained that, while it could entertain those counts under its supplemental jurisdiction, "those claims present questions of state law which would otherwise predominate over the federal claim present here."[12]

On February 2, 2009, the district court denied Utopia's motion for summary

---

[10]  Count I and II prayed for both legal and equitable relief.  Count III sought damages only.

[11]  Utopia also moved for summary judgment on Count III.

[12]  Utopia subsequently re-filed its state law claims in the Circuit Court of Broward County, Florida.

judgment and granted Pro-Med's motion on Count I. The court concluded that ED Maximus was not subject to copyright protection because ED Maximus was a series of blank forms, which did not convey information. Utopia's appeal and Pro-Med's cross-appeal followed.[13]

## II.

These appeals present two issues.[14] First, whether the district court erred in granting Pro-Med's motion for summary judgment on Utopia's copyright infringement claim. Second, whether the district court erred in its sua sponte dismissal of Utopia's state law claims. The parties both assert error in this dismissal on different bases—Pro-Med claims that Utopia's state law claims fell within the exclusive jurisdiction of the United States district courts and were preempted by the Copyright Act; Utopia claims that the district court's refusal to exercise supplemental jurisdiction over the state law claims was an abuse of discretion. We consider these issues in order.

## A.

The district court awarded Pro-Med summary judgment on Utopia's

---

[13] We have jurisdiction under 28 U.S.C. § 1291, which provides that "courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

[14] Utopia has also appealed the district court's award of $10,977.15 in costs to Pro-Med, but agrees that Pro-Med is entitled to this amount if it prevails on appeal.

copyright infringement claim on the basis that ED Maximus templates were "blank forms" and thus not entitled to copyright protection. Utopia's challenge to the court's ruling presents a question of law.[15]

A certificate of registration from the United States Copyright Office, such as the certificate Utopia possessed, is prima facie evidence of the copyrightability of a work, So. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers, 756 F.2d 801, 811 (11th Cir. 1985); however, "[w]here other evidence in the record casts doubt on the question, validity will not be assumed." Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir. 1980).

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression," including literary works. 17 U.S.C. § 102(a) (emphasis added). "The sine qua non of copyright is originality." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 345, 111 S. Ct. 1282, 1287 (1991). As used in copyright, original means that the "work was independently created by the author" and "possesse[d] at least some minimal degree of creativity." Id. (citing 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990)).[16]

---

[15] A question of law is created when we view the record before the district court in the light most favorable to the non-movant. Utopia is the non-movant on Pro-Med's motion for summary judgment on the Count I copyright claim.

[16] Originality is a constitutional requirement. Feist, 499 U.S. at 346, 111 S. Ct. at 1288.

Copyright protection does not, however, extend to anything in the work of authorship that constitutes an "idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

"It is well-established that blank forms which do not convey information or contain original pictorial expression are not copyrightable." John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 971 (11th Cir. 1983) (citing Baker v. Selden, 101 U.S. 99, 107 (1880)). Examples of blank forms include "time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information." 37 C.F.R. § 202.1(c).[17]

---

[17] Some courts have adopted a "bright-line" rule regarding blank forms; that is, they hold that blank forms inherently do not convey information and are not copyrightable. The Ninth Circuit took this approach in Bibbero Sys., Inc. v. Colwell Sys., Inc., 893 F.2d 1104 (9th Cir. 1990). The court rejected the argument that a blank form could satisfy the "convey information" test by containing possible categories of information, thus indicating which information was important. Id. at 1107. If categories of information were sufficient to "convey information," according to the court, the copyrightability of blank forms would be "potentially limitless. All forms seek only certain information, and, by their selection, convey that the information sought is important. This cannot be what the Copyright Office intended by the statement 'convey information' in 37 C.F.R. 202.1(c)." Id.

The majority of circuits have rejected Bibbero's bright-line approach. See, e.g., Kregos v. Associated Press, 937 F.2d 700, 709 (2d Cir. 1991) ("[A]ll forms need not be denied protection simply because many of them fail to display sufficient creativity."); Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1242–43 (3d Cir. 1986) (noting that the Third Circuit, "like the majority of courts that have considered this issue . . . ha[s] held that blank forms may be copyrighted if they are sufficiently innovative that their arrangement of information is itself informative"). Although the Ninth Circuit characterized the Eleventh Circuit's approach in

11

ED Maximus is a set of charts for a physician to use to record a patient's

medical history and present symptoms. The charts contain headings such as

"History of Present Illness" and room thereunder for a physician to fill out the

patient's unique medical information. The relevant test for copyrightability of ED

Maximus, therefore, is whether its forms "convey information." The forms, before

they are filled out, most certainly do not convey any information about a patient.

The only way that the ED Maximus forms could convey information would be in

the selection of the terms on the forms; that is, if they convey information to the

doctors about what questions they should be asking.

Our relevant precedent on how to determine whether a form conveys

information is our decision in Clarke Checks. John H. Harland Co. created a

product to address the portability problem associated with desk-style checkbooks.

711 F.2d at 969. Harland inserted a small, carry-around stub between the check

<hr>

Clarke Checks as adopting the "bright-line" approach that blank forms cannot be copyrighted, the Ninth Circuit's reading of Clarke Checks does not comport with our reading of it. Bibbero, 893 F.2d at 1107. The Clarke Checks court's statement that "blank forms which do not convey information . . . are not copyrightable" does not indicate a view that blank forms cannot convey information. 711 F.2d at 971. Moreover, the court's analysis went beyond identifying the check stub at issue as a blank form; the court analyzed whether it conveyed "information beyond that contained on previously existing check stubs," indicating that it would be possible for a check stub, although a blank form, to convey information. Id. at 972. We therefore look to the "convey information" test to analyze whether ED Maximus is copyrightable, and do not end the analysis merely by labeling it a blank form.

and the checkbook's permanent stub, so that a person could comfortably travel with a check and the carry-around stub.  Id.  Clarke Checks, Inc. soon modified its desk checkbook to include an intermediate carry-around stub.  Harland brought suit against Clarke Checks on a number of claims, including copyright infringement.  Id. at 970–71.  The district court ruled in favor of Clarke Checks, and we affirmed:

> Harland's Memory Stub does not convey any information beyond that contained on previously existing check stubs which are manufactured by numerous bank stationery companies.  The Memory Stub merely provides lines on which the check writer can record the date, the dollar amount of the check, the payee of the check, and the purpose of the check.  Thus, we agree with the district court that Harland's Memory Stub is merely designed for recording information and does not convey information or contain original pictorial expression.  Consequently, we affirm the grant of summary judgment on the ground that the "Memory Stub expression" was not copyrightable.

Id. at 972 (citation omitted).[18]

---

[18]  Utopia argues that the Supreme Court's decision in Feist modified the Eleventh Circuit standard as announced in Clarke Checks.  Utopia argues it did so by specifying that compilations need only minimal creativity to be copyrightable; they are copyrightable "so long as [choices as to selection and arrangement] are made independently by the compiler and entail a minimal degree of creativity."  Feist, 499 U.S. at 348, 111 S. Ct. at 1289.  Utopia ignores, however, that Feist dealt with how to resolve the tension between facts generally not being copyrightable and factual compilations being copyrightable.  Feist held that a factual compilation may be copyrightable "if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement."  Id. at 350–51, 111 S. Ct. at 1290 (emphasis added).  Feist did not imply in any way that the rule concerning the creativity in selection of facts was a standard that applied to anything but factual compilations or impacted the blank forms rule.  While we note that the creativity in the selection of terms on the ED Maximus forms bears on whether the forms convey information, the "convey information" standard—not a creativity in selection or arrangement standard—still governs blank forms and was not altered by the Feist

13

While we know from Clarke Checks that a check stub asking for the date, the dollar amount of the check, the payee of the check, and the purpose of the check does not convey information, Clarke Checks does not set forth a clear test for determining whether a form conveys information, and the information requested through the ED Maximus forms is more expansive than that in Clarke Checks. The Second Circuit's decision in Kregos v. Associated Press, 937 F.2d 700 (2d Cir. 1991), is more helpful in this regard. There, the Second Circuit explained that blank forms do not convey information if the

> headings [are] so obvious that their selection cannot be said to satisfy even minimal creativity . . . . Such a work conveys no information, not just because it contains blanks, but because its selection of headings is totally uninformative. On the other hand, if a scorecard or diary contained a group of headings whose selection (or possibly arrangement) displayed cognizable creativity, the author's choice of those headings would convey to users the information that this group of categories was something out of the ordinary.

Id. at 708–09.

The Second Circuit offered examples of works with obvious headings versus works with headings that convey information. A baseball scorecard with columns headed "innings" and lines headed "players" and a travel diary with

decision concerning factual compilations. Utopia's argument that the selection and arrangement of terms in the ED Maximus templates show "extraordinary degrees of creativity and originality," therefore, is relevant only to the extent that it shows the forms convey information.

14

headings for "cities," "hotels," and "restaurants" would fall into the former category; books intended to record the events of a baby's first year or a European trip, depending on the suggestions of items to record and their arrangement, could fall into the latter.[19]  Id. at 709.

In accordance with these principles, we examine whether the selection of information requested by the ED Maximus forms or its arrangement is informative or out of the ordinary.  We look first to whether the headings are anything other than what would be expected on such a medical template, and second to whether the terms actually convey information to the treating physician.  We find that each

---

[19]  The Third Circuit's approach in Whelan accords with the Second Circuit's approach. In Whelan, the Third Circuit examined whether file structures used to organize the business aspects of a dental laboratory were copyrightable under the blank forms doctrine.  797 F.2d at 1243.  Defendants did not argue that the files did not convey information, and the court noted that such an argument would fail.  Id.  Not only were the files complex and detailed, but

> there are many ways in which the same goal—the organization of the business aspects of a dental laboratory—might be accomplished, and several of these approaches might use significantly different file structures.  The file structures in the Dentalab and Dentcom systems require certain information and order that information in a particular fashion.  Other programs might require different information or might use the same information differently.  When we compare the comprehensiveness and complexity of the file structures at issue here with the "blank forms" at issue in the cases mentioned above, we have no doubt that these file structures are sufficiently informative to deserve copyright protection.

Id. (footnote omitted); cf. Gentieu v. Tony Stone Images/Chicago, Inc., 255 F. Supp. 2d 838, 848 (N.D. Ill. 2003) (holding that photographic poses "are not copyrightable elements where they follow necessarily from the choice of the subject matter or are otherwise unoriginal").

15

of the forms calls for the same information that any responsible physician would ask a patient with the given ailment. We reach this conclusion through our own examination of the forms and an analysis of McHale's deposition, the evidence most favorable to Utopia.

The originality claimed in the forms is in the "selection and arrangement of the terminology" used in the templates. We find that the selection and arrangement of the terms does not convey information and is not sufficiently original. As a starting point, we note that if the correct way to perform an action is well established in a profession, we fail to see how a description of how to perform that action can be original.[20] Looking to the forms themselves, the first section on the forms is the same regardless of the ailment, calling for personal information such as the patient's name, date of birth, sex, and chief complaint.

The forms then call for the history of the present illness, a review of systems, medical and social history, physical exam, medical decision making, clinical impressions, and finally, consultation, disposition, and instructions. The

---

[20] Cf. Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l, 533 F.3d 1287, 1305 (11th Cir. 2008) (explaining that a claim that sales techniques were pilfered from other salesmen "misse[d] the mark" because "many of the sales techniques described in the book were nothing new to a profession that is one of the world's oldest"). We do not in this opinion mean to imply that, for example, if a new disease arose, and if there was an actual controversy on how to treat the disease, an experienced physician could not copyright a form that informed a physician as to how to treat a patient.

subcategories on the forms are often very similar, even when the complaints are very different. For example, the history of present illness subcategories (e.g., timing, duration, location) are identical on the forms for "Lower Extremity/Ankle/Foot" and "Chest Pain" with the exception of "Cardiac Risk Factors" being listed as an additional subcategory on the latter form. The questions in these categories differ only inasmuch as would be expected given the different type of complaint. For example, the lower extremity form asks for an evaluation of ankle range of motion in the physical exam, whereas the chest pain form calls for an exam of the lungs. Given that the forms are for routine, superficial exams, however, we would not expect disagreement on the questions presented on a specific type of complaint.

Turning to the evidence submitted by the parties, McHale, in his deposition, agreed that it is "common when [a doctor] examin[es] a patient in the emergency department to go through all of the different major headings" that were on the ED Maximus templates and that the content in the ED Maximus forms was content that a physician doing a systems review of an emergency room patient would "consider" as a "part of [his] job."[21] McHale nonetheless asserted that the terms

---

[21] Although the forms contain diagrams of the relevant parts of the body, there is no copyright claimed in the pictorial expression on the forms. McHale admitted there was "nothing special about having a picture on a template of the front of someone's head and the back" and

17

would not necessarily be considered in that order or documented in that fashion. When pressed on this point, McHale agreed that the first thing a doctor in the emergency department generally does is inquire about the history of the present illness, and that is why it was the first substantive portion of every ED Maximus template. Likewise, the review of systems would be the next step taken. The medical and social history would also be taken; it would not necessarily follow next, but McHale conceded that taking it next "would [not] be unusual." Certainly, McHale did not "invent the idea" of doing a medical and social history after the review of systems or doing a physical exam after the medical and social history.

Our review of the forms and McHale's testimony indicates that the headings and subcategories on the ED Maximus forms are what one would expect to find on such a medical template. The ED Maximus forms, therefore, are better analogized to the non-copyrightable baseball scorecard or travel diary with generic headings described by the Second Circuit than to a possibly copyrightable book about a baby's first year or the file structures used to organize a dental laboratory.

We next look to the question of whether the headings actually conveyed

that it was "commonplace when . . . documenting the examination in the emergency department to consider diagrams" like the ones on the ED Maximus forms in making an analysis.

18

information to treating physicians.  McHale agreed that the function of the ED Maximus template was to record or capture the information gathered during a patient encounter.  McHale stated that the template could "prompt" a patient encounter in that "some people need to be prompted" to capture all of the elements of a patient encounter, including billing, coding, and medical legal aspects.  When McHale was asked whether the "prompting" he described referred to capturing information or adequately addressing the needs of the patient, however, he conceded that the template did not do the latter—the template did not have "anything to do with the actual patient care."  McHale further clarified that "[t]he practice of medicine is an art and science.  We are talking a documentation form that you are capturing that encounter on.  So, I don't think there is any documentation to help anyone practice medicine."  In sum, McHale agreed that the "template doesn't prompt the physician to adequately care for the patient" but rather "prompts the physician to capture the information that derives from providing the care."[22]  Indeed, when McHale was directly asked whether the forms

---

[22] McHale's testimony is consistent with the testimony offered by Lee Clark, who was the chief nursing officer at Lake Wales Medical Center and hired by Pro-Med to revise and upgrade the template system and to assist in developing EPD.  Clark agreed that there is a "methodology that physicians follow with respect to questioning and examining emergency department patients" consistent between hospitals, and that ED Maximus as well as other medical templates with which he was familiar were consistent with that methodology.  It would not be "possible to provide competent and adequate care of an emergency department patient without asking about their history" or the other systems identified in the exhibits.  The ED

19

conveyed information, he agreed that the forms do not "[c]onvey information" before they are filled out nor "tell an emergency physician how to do his job." He characterized them instead as a "means for capturing and retaining information."

Between our independent review of the ED Maximus forms and especially the uncontradicted evidence gleaned through depositions, we are unconvinced that the selection or arrangement of terms in the ED Maximus forms is original or conveys information. Therefore, we find that the ED Maximus forms are not copyrightable. Accordingly, the district court did not err in granting Pro-Med's motion for summary judgment on Utopia's copyright infringement claim.[23]

---

Maximus templates did not provide new capabilities that Clark had not previously seen on medical templates.

According to Clark, the function of the ED Maximus forms was not to "tell the physician how to do his job," but rather to act "a means for him to record what he's done." The forms were not responsible for walking a physician through the steps because "[h]e's supposed to know the steps."

[23] We recognize that our holding may be in tension with Norton Printing Co. v. Augustana Hosp., 155 U.S.P.Q. 133 (N.D. Ill. 1967). There, Augustana Hospital brought a motion to dismiss Norton Printing Co.'s copyright infringement claim, asserting that Norton Printing Co.'s medical laboratory test forms were not copyrightable. Id. at 134. The court denied the motion to dismiss after an examination of the forms, noting that they were "quite detailed and contain[ed] many separate categories and areas for examination." Id. at 135. In addition to recording information, "the format and arrangement used, together with the different boxes and terms . . . also serve[d] to convey information as to the type of tests to be conducted and the information which [was] deemed important." Id.

We have applied the same test—looking at whether the terms conveyed information as to the types of questions to be asked and tests to be conducted or as to the information which was deemed important—and have reached the opposite conclusion. We do not know the content of the forms in the Norton case, so we cannot determine whether our case is factually distinguishable.

20

B.

Having found that the district court did not err in granting Pro-Med's motion for summary judgment on Utopia's copyright infringement claim, we turn to the question of whether the district court erred in its sua sponte dismissal of Utopia's state law claims. Pro-Med asserts that certain of Utopia's state law breach of contract claims fall within the exclusive jurisdiction of the United States district courts and are preempted by the Copyright Act. Utopia asserts that the district court's refusal to exercise supplemental jurisdiction over the state law breach of fiduciary duty and breach of contract claims was an abuse of discretion. We consider these arguments in turn.

First, Pro-Med cross-appeals the district court's sua sponte dismissal of "certain of Utopia's breach of contract claims." Appellees' Brief at 37. In Count III, Utopia alleges that Pro-Med breached their contract by failing to pay royalties on EPD and Pro-Med Maximus, competing against the Maximus templates with EPD; failing to report revenue derived from EPD, falsely reporting revenue from EPD, and continuing to sell Pro-Med Maximus and EPD after the License Agreement expired.

While it is not entirely clear which of these breach of contract claims Pro-Med contends are preempted by federal copyright law, we deduce from Pro-Med's

21

brief that it is referring to all of Utopia's claims regarding EPD as well as claims relating to the use of the Maximus templates after the License Agreement expired. Pro-Med contends that the License Agreement does not govern these claims; therefore, they are merely disguised copyright infringement claims and are preempted by the Copyright Act.

> The Copyright Act preempts

> legal or equitable rights [under state law] that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.

17 U.S.C. § 301(a). In Crow v. Wainwright, 720 F.2d 1224, 1225–26 (11th Cir. 1983), we recognized a two-part test to be applied in copyright preemption cases. Preemption occurs if the rights at issue (1) "fall within the 'subject matter of copyright' set forth in sections 102 and 103" and (2) "are 'equivalent to' the exclusive rights of section 106." Id. (quoting Harper & Row, Publishers, Inc. v. Nation Enters., 501 F. Supp. 848, 850 (S.D.N.Y. 1980)).

In this case, the district court rejected Pro-Med's preemption argument. "We review the district court's preemption determination de novo." Lipscher v. LRP Publ'ns, Inc., 266 F. 3d 1305, 1310 (11th Cir. 2001) (citing Irving v. Mazda Motor Corp., 136 F.3d 764, 767 (11th Cir. 1998)).

Lipscher explains when the Copyright Act preempts state law claims. In

Lipscher, LRP Publications, Inc. violated a subscription agreement it signed with

Law Bulletin Publishing Company by making copies of materials covered by the

subscription agreement. Id. at 1309. On appeal, the parties agreed that Law

Bulletin did not hold a valid copyright in the material at issue. We held that Law

Bulletin's state law claims based on a state deceptive trade practices act and

common law unfair competition were preempted by federal copyright law, but that

its breach of contract claim was not. Id. at 1310–12, 1318–19.

Looking to the two-part preemption test set forth in Wainwright, the

Lipscher court found that because the material at issue was a compilation of facts,

all of Law Bulletin's claims fell "within the 'subject matter of copyright.'" The

determinative element, therefore, was whether the rights asserted were

"'equivalent to' the exclusive rights of section 106." "The exclusive rights under

the Copyright Act include the right to reproduce the copyrighted work, to prepare

derivative works, and to distribute copies to the public." Id. at 1311 (citing 17

U.S.C. § 106). To determine whether the rights asserted in a claim are equivalent

to these rights,

> [w]e employ an "extra element" test such that "if an extra element is
> required instead of or in addition to the acts of reproduction,
> performance, distribution or display, in order to constitute a

state-created case [sic] of action, then the right does not lie within the general scope of copyright and there is no preemption."

Id. at 1311–12 (quoting Foley v. Luster, 249 F.3d 1281, 1285 (11th Cir. 2001)).

We held that the state law deceptive trade practices act and unfair competition claims were preempted because the rights Law Bulletin was "attempting to protect in its acquisition misconduct claims [were] copyright rights." Id. at 1312. Law Bulletin's breach of contract claim, however, was not preempted: Law Bulletin "sought to enforce rights created by a simple two-party contract, not copyright rights. As the Seventh Circuit has stated, claims involving two-party contracts are not preempted because contracts do not create exclusive rights, but rather affect only their parties." Id. at 1318 (citing ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1454–55 (7th Cir. 1996)).[24] "[C]ourts generally read preemption clauses to leave private contracts unaffected." Id. (citing ProCD, 86 F.3d at 1454–55).[25] The "extra element" test was satisfied by Law Bulletin's need

---

[24] The License Agreement purported to create "an exclusive agreement." Pro-Med was to be the exclusive marketing agent for Utopia, and Utopia was to refer all potential clients to Pro-Med. We do not see how this changes the analysis, however; even if the parties could not take certain actions vis-à-vis third parties, that should not make the bargain struck between Utopia and Pro-Med less enforceable.

[25] See also Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th Cir. 2005) ("Most courts have held that the Copyright Act does not preempt the enforcement of contractual rights."); Bowers v. Baystate Techs., Inc., 320 F.3d 1317, 1324–25 (Fed. Cir. 2003) ("[M]ost courts to examine this issue have found that the Copyright Act does not preempt contractual constraints on copyrighted articles."); Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 431 (8th Cir. 1993) ("[T]he alleged contractual restriction on National's use of the

24

to show the existence of a valid contract between the parties.

Applying Lipscher, we find generally that Utopia's breach of contract claims are not preempted.[26] To succeed on its breach of contract claims, Utopia must prove a valid license agreement, which constitutes an "extra element" under Lipscher.[27] The rights Utopia asserts, therefore, are not "equivalent to" exclusive rights under section 106, as required for preemption under the second prong of the Wainwright preemption test.[28]

Pro-Med argues that even if Utopia's breach of contract claim is not wholly

---

licensed programs constitutes an extra element in addition to the copyright rights making this cause of action qualitatively different from an action for copyright."); cf. Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 222, 115 S. Ct. 817, 820 (1995) (holding "that the [Airline Deregulation Act's] preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves").

[26] This holding also makes sense on public policy grounds. Parties may enter a license agreement to avoid the cost of having to litigate the validity of a copyright, and this bargain between the parties should be honored. See Aronson v. Quick Point Pencil Co., 440 U.S. 257, 265, 99 S. Ct. 1096, 1100–01 (1979) (noting that "a pending patent application gives the applicant some additional bargaining power," the amount of which is derived from "how likely the parties consider it to be that a valid patent will issue").

[27] We also note that our finding in part II.A, supra, that ED Maximus is not copyrightable, is not dispositive of any claims stemming from the License Agreement. License agreements, like subscription agreements, "are not invalidated merely because the information is publicly available." Lipscher, 266 F.3d at 1319; see also Aronson, 440 U.S. at 262, 99 S. Ct. at 1099 (1979) ("Commercial agreements . . . [are] not displaced merely because the contract relates to intellectual property which may or may not be patentable.").

[28] Utopia also argues that preemption is inappropriate because the first element of the Wainwright test is not satisfied; if, as Pro-Med argues, blank forms fall outside the scope of copyright protection, it is contradictory to assert that the material at issue "fall[s] within the 'subject matter of copyright.'" Because we have found that the second element of the Wainwright preemption test is not satisfied, we need not reach this argument.

25

preempted, <u>certain</u> of the breach of contract claims should be dismissed because the License Agreement does not encompass them. Of course, Utopia cannot, pursuant to the License Agreement, recover for any actions Pro-Med took that were not covered by the License Agreement; that is simply acknowledging that actions outside the scope of a contract cannot be said to breach that contract. To the extent that is Pro-Med's argument, it is correct—but we need not parse through Utopia's claims here to decide what is covered by the License Agreement. That is a matter of state law, and we leave it to the state court before which these claims are currently pending to perform the task.[29]

We now briefly turn to Utopia's argument that the district court abused its discretion by not exercising supplemental jurisdiction over Utopia's state law claims. Pursuant to 28 U.S.C. § 1367(a), a district court has "supplemental

---

[29] Utopia's breach of contract claim indisputably covers Pro-Med's alleged failure to pay royalties on Pro-Med during the period the License Agreement was in effect. Pro-Med does not argue that this claim would be preempted; rather, Pro-Med argues that we can dismiss all of the claims related to EPD, and the claims related to the use of Pro-Med Maximus and EPD after the License Agreement expired, because they are not covered by the License Agreement. Both of these points, however, are disputed. The License Agreement specifically stated that it extended to any software product "which uses or employs a full or partial copy of any Licensed Material." It even contemplated that such a software product could include "the printing and manual completion of Charts, <u>as well as the creation of an electronic medical record based on or derived from the Charts</u>." (emphasis added). Whether an electronic product can contain a partial copy of the Licensed Material is not immediately clear. The License Agreement also has provisions that address what would happen to the Licensed Materials following the expiration of the contract. We do not find it prudent to dismiss "certain" of Utopia's breach of contract claims; it is arguable that all of Utopia's breach of contract claims fall under the License Agreement, and the state court will be responsible for determining the scope of the Agreement.

26

jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Given that the district court had original jurisdiction over Utopia's copyright claim, and that the conduct underlying the state law claims was the same conduct underlying the copyright claim, the district court had supplemental jurisdiction over Utopia's state law claims. A district court may, however,

> decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>> (1) the claim raises a novel or complex issue of State law,
>> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Here, prior to dismissing Utopia's copyright claim, the district court sua sponte determined that "such state law claims would tend to dominate the federal claim and obscure its significance." Therefore, pursuant to § 1367(c)(1) and (2), the court "exercise[d] its discretion and dismiss[ed] the state law claims."[30]

---

[30] We note that the district court, after dismissing the copyright law claim, also could have dismissed the state law claims pursuant to § 1367(c)(3).

27

On appeal, Utopia argues that the district court erred by refusing to entertain Utopia's state law claims through supplemental jurisdiction. "We review the district court's decision not to exercise supplemental jurisdiction for abuse of discretion." Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 738 (11th Cir. 2006). "As a practical matter, the district court is in the best position to weigh the competing interests . . . in deciding whether it is appropriate to exercise supplemental jurisdiction." Lucero v. Trosch, 121 F.3d 591, 598 (11th Cir. 1997).

In addition to Utopia's breach of contract claim in Count III, reviewed supra, Utopia set forth a breach of fiduciary duty claim against Pro-Med and Grossjung in Count II. Utopia asserted that these defendants breached their fiduciary duties to Utopia by putting Pro-Med's interests ahead of Utopia's by marketing and selling EPD, which competed with Pro-Med Maximus; taking unfair advantage of Pro-Med's position in collecting revenues from sales of EPD and Pro-Med Maximus by refusing to pay Utopia royalties, withholding revenue information and falsely reporting revenue information; using the Licensed Materials solely for Pro-Med's benefit and to Utopia's detriment; demanding concessions regarding royalties; and refusing to pay royalties.

In order to resolve Utopia's breach of contract claim, a court will need to examine the scope of the License Agreement, applying state law, which may be an

28

arduous task.  See supra note 29.  It will need to decide whether Pro-Med owes any royalties on EPD, and if so, for which versions.  Then, the court will need to comb through the record to deduce the royalties that Pro-Med paid and which, if any, royalties are still owed.  The breach of fiduciary duty claims will also require an in-depth analysis of the duties owed by Pro-Med to Utopia under state law. Given the deference we afford a district court's decision whether to exercise supplemental jurisdiction, we cannot say that the district court abused its discretion by finding that adjudicating Counts II and III would require resolution of complex issues of state law and would predominate over the federal claim.  We therefore affirm on this issue as well.

III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.