[Cite as *TruLogic, Inc. v. Gen. Elec. Co.*, 2021-Ohio-2860.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| TRULOGIC, INC. | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2021-CA-3 |
| | : | |
| v. | : | Trial Court Case No. 2020-CV-464 |
| | : | |
| GENERAL ELECTRIC COMPANY | : | (Civil Appeal from |
| through its GEA DIVISION | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of August, 2021.

. . . . . . . . . . .

D. JEFFREY IRELAND, Atty. Reg. No. 0010443, BRIAN D. WRIGHT, Atty. Reg. No. 0075359 and DONALD E. BURTON, Atty. Reg. No. 0040553, 110 North Main Street, Suite 1600, Dayton, Ohio 45402
    Attorneys for Plaintiff-Appellant

APRIL L. BESL, Atty. Reg. No. 0082542 and JACI L. OVERMANN, Atty. Reg. No. 0089306, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202
    Attorneys for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, TruLogic, Inc., appeals from a judgment granting a Civ.R. 12(B)(6) motion filed by Defendant-Appellee, General Electric Company through its GEA Division ("GEA"). According to TruLogic, the trial court erred in concluding that its claims for breach of contract and unjust enrichment were preempted by federal copyright law.

{¶ 2} We conclude that TruLogic's claim for breach of contract was not preempted by federal copyright law. A software licensing agreement may involve the required extra element (instead of or in addition to the acts of reproduction, performance, distribution, or display) that changes the action's nature so that it is qualitatively different from a copyright infringement claim. Under the allegations of the complaint, accepted as true, TruLogic's restriction of the use of its software and other restrictions in the software licensing agreement provided the extra element required to avoid preemption.

{¶ 3} However, the trial court did not err in dismissing TruLogic's claim for unjust enrichment. Unjust enrichment involves a contract implied in law. Where an express agreement exists, there can be no implied agreement. Further, while parties are permitted to plead alternative claims, the allegations in the complaint and the attached software licensing agreement provided that the written agreement was the entire agreement of GEA and TruLogic and superseded all prior or contemporaneous oral or written communications, proposals, and representations with respect to TruLogic's software or any other subject matter covered by the software agreement. As a result, regardless of preemption, there could be no claim for unjust enrichment.

{¶ 4} Finally, even if we needed to address preemption of the unjust enrichment claim, TruLogic's minimal defense of the claim did not address the reasons why

preemption law distinguishes between contracts implied in law and those based on either an express contract or one implied in fact. Specifically, contracts implied in law do not involve allegations of actual promises between the parties. Such promises can provide the required extra element to avoid preemption.

{¶ 5} Accordingly, TruLogic's first assignment of error will be sustained and its second assignment of error will be overruled. The judgment, therefore, will be reversed in part and affirmed in part, and this cause will be remanded for further proceedings.

## I.  Facts and Course of Proceedings

{¶ 6} Before we discuss the factual background, we note that this case is before us following a Civ.R. 12(B)(6) dismissal. As a result, we will accept the facts alleged in the complaint as true. *Mitchell v. Lawson Milk Co*., 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988).

{¶ 7} According to the complaint, TruLogic was founded in 1998 and provides electronic data solutions to the United States and foreign military services, as well as to automotive systems manufacturing facilities. TruLogic specializes in products and services supporting "technical writing, illustrating, data management, and publishing." Complaint at ¶ 4.

{¶ 8} In 2000-2001, TruLogic used its proprietary publishing platform, TruView™, to develop Interactive Electronic Technical Manuals ("IETMs") for the United States Navy. *Id*. at ¶ 5. Shortly thereafter, in 2002, GEA expressed an interest in having TruLogic replace its current supplier of IETMs for engine-related technical services to the United States Air Force ("USAF"). *Id*. at ¶ 6. After TruLogic demonstrated its product and bid

on the work, GEA awarded TruLogic a four-year contract to supply IETMs. These IETMs incorporated GEA data for the USAF's use in connection with its use of GEA products. *Id.* at ¶ 7. In addition, as GEA's service supplier, TruLogic performed the routine update service of Standardized Generalized Markup Language (SGML)-based aircraft engine technical manuals and "provided modified, GE-branded Interactive Electronic Technical Manual (IETM) products from 2002 to 2012 utilizing TruLogic's pre-existing commercial software products." *Id.* at ¶ 8.

{¶ 9} TruLogic again bid on the GEA IETM contract in 2006 and won the bid, thus continuing contractual relations with GEA on the USAF contract until 2012. *Id.* at ¶ 9-10. In order to fulfill the contract for IETM deliverables, TruLogic licensed the use of the IETMs that it had developed to GEA and its customer, USAF. *Id.* at ¶ 11. Although GEA supplied the technical content, TruLogic developed the style and format, and it produced the IETMs using its proprietary, copyrighted publishing platform, TruView™. *Id.* TruView™ pre-existed TruLogic's contractual relationship with GEA and was not developed as part of that relationship. *Id.* at ¶ 12. "TruLogic has never given GEA or anyone else the right or option to reverse-engineer or to reuse components of its software." *Id.* at ¶ 14.

{¶ 10} Beginning in 2008, TruLogic licensed IETMs to GEA under an end user license agreement ("EULA"), which let GEA use the IETM in its deliverables to GEA customers. Complaint at ¶ 15. However, the EULA restricted any other uses, "including specifically prohibiting any repurposing or creation of derivatives of the TruView™ IETM." *Id.* TruLogic attached a copy of the 2008 EULA to the Complaint, and while it has been updated from time to time, the terms have essentially remained the same. *Id.* at ¶ 16-17

and Ex. A ("2008 EULA").

{¶ 11} The EULA was a "click-thru" agreement, and GEA and USAF could not have used TruLogic's software without accepting it; the license terms appeared at the time of installation of TruView™, and users could not install the software if they did not click on the button accepting the EULA.   *Id.* at ¶ 18.   In pertinent part, the EULA stated:

## SOFTWARE LICENSE AGREEMENT

**FOR GE AVIATION INTERACTIVE ELECTRONIC TECHNICAL MANUAL (IETM) SYSTEM**.

PLEASE READ THIS SOFTWARE LICENSING AGREEMENT CAREFULLY BEFORE INSTALLING OR USING THE SOFTWARE.

BY CLICKING ON THE "ACCEPT" BUTTON DURING THE INSTALLATION PROCESS, OR BY USING THIS SOFTWARE, YOU ARE CONSENTING TO BE BOUND BY THIS AGREEMENT.   IF YOU DO NOT AGREE TO ALL OF THE TERMS OF THIS AGREEMENT, CLICK THE "DO NOT ACCEPT" BUTTON AND THE INSTALLATION PROCESS WILL TERMINATE.

2008 EULA, p. 1.

{¶ 12} According to the EULA, the GEA system consisted of three individually copyrighted components.   *Id.* at p. 1.   The relevant component here is Component 1, which was described as "TruView™ Interactive Electronic Technical Manual (IETM) System SOFTWARE – a LICENSED BY-PRODUCT of the TruView™ Publisher (the IETM CORE SOFTWARE) developed and owned by TruLogic, Incorporated."   *Id.* Concerning Component 1, the EULA stated, in relevant part, as follows:

**SOFTWARE END-USER LICENSE AGREEMENT FOR COMPONENT 1 -**

TRUVIEW INTERACTIVE ELECTRONIC TECHNICAL MANUAL (IETM) SYSTEM SOFTWARE (the BYPRODUCT) (BRANDED – GE AVIATION IETM*)

THIS IS A NONEXCLUSIVE LICENSE FOR COMMERCIAL COMPUTER SOFTWARE – RESTRICTED RIGHTS

IMPORTANT – READ CAREFULLY.   This TruLogic End-User License Agreement ("EULA") is a legal agreement between you (either an individual or a single entity) and TruLogic, Incorporated for the TruView SOFTWARE identified above, which may include computer SOFTWARE, associated media, printed materials, and "online" or electronic documentation ("SOFTWARE").   By downloading, installing, copying, or otherwise using the SOFTWARE, you agree to be bound by the terms of this EULA.   The originating acquiring entity will be reimbursed the direct labor cost (the service) associated with TruLogic's IETM build process for the specific IETM system affected upon return or certified destruction of the rejected original master copies delivered and all copies reproduced or installed.

The SOFTWARE is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties.   TruLogic or its suppliers own the title, copyright, and other intellectual property rights in the SOFTWARE.   The SOFTWARE is licensed, not sold.

**GRANT OF NONEXCLUSIVE LICENSE**.   TruLogic, Inc., and its suppliers grant you ("the Customer") a nonexclusive, perpetual, fully paid-up license

to use the TruView Interactive Electronic Technical Manual (IETM) System SOFTWARE as provided.

GENERAL.   You may reproduce the SOFTWARE (in its entirety), install and use any number of copies of the SOFTWARE on any number of computers, including workstations, terminals, or other digital electronic devices, for the intended use.

CONTROL.   The SOFTWARE shall be DISCLOSED, DISTRIBUTED, CONTROLLED, HANDLED AND DESTROYED in an official capacity commensurate with the statements provided on the title pages of the documents contained within the accompanying customer-provided TECHNICAL DATA.   The expired SOFTWARE, including TruLogic's set up and all resulting installations shall be properly disposed of in a method that prevents disclosure, unauthorized use and reassembly.

REDISTRIBUTION.   If you reproduce and redistribute the SOFTWARE your copy must be a true and complete copy of the SOFTWARE, including TruLogic's set up and all copyright notices, logos, end-user license agreement and/or trademarks that appear in the SOFTWARE as received from TruLogic.   This SOFTWARE may be redistributed to support the IETM distribution requirements of GE Aviation, its customers, authorized suppliers and team members; the U.S. Air Force and authorized recipients of the TECHNICAL DATA; other U.S. Government Agencies; U.S. State Governments and authorized Foreign Governments only.

INTENDED USE.   The SOFTWARE is licensed specifically to be used in

an OFFICIAL USE ONLY capacity. The SOFTWARE is licensed for the purposes of installing, hosting, navigating, displaying and recording customer-provided technical data in an official capacity. You shall not use, copy, disassemble, display, distribute or demonstrate the SOFTWARE or its likeness for the purposes of soliciting, guiding, developing, defining or improving competing products or services.

UNAUTHORIZED RELEASE. The SOFTWARE is Commercial Computer SOFTWARE and as such is copyrighted by TruLogic under the Copyright Act of 1976 (17 U.S.C. 106) and is licensed with restricted rights. The SOFTWARE SHALL NOT be released or sold to the public nor shall it be released under the Freedom of Information Act (DoD 5400.7-R).

INTELLECTUAL PROPERTY RIGHTS – SOFTWARE. All rights and intellectual property rights in and to the SOFTWARE (including but not limited to any upgrades, modifications, images, photographs, animations, video, audio, text and "applets" or other mechanisms incorporated into the SOFTWARE), and any copies you are permitted to make herein are owned by TruLogic or its suppliers.

INTELLECTUAL PROPERTY RIGHTS – CONTENT. All title and intellectual property rights in and to the TECHNICAL DATA/TECHNICAL CONTENT which may be accessed or recorded through use of the SOFTWARE is the property of the respective content owner and may be protected by applicable copyright or other intellectual property laws and treatises. This EULA grants you no rights to use, copy or modify such

content.

U.S. GOVERNMENT LICENSE RIGHTS. For U.S. Government users of this SOFTWARE, the SOFTWARE shall be identified as having been developed at private expense and as "restricted computer software" submitted with restricted rights in accordance with subparagraphs (a) through (c) of the Commercial Computer Software – Restricted Rights clause of FAR 52.227-19 and its successors. For all units of the Department of Defense, the SOFTWARE shall be identified as "commercial computer software" or "commercial computer software documentation" under the Rights in Computer Software and Computer Software Documentation Clause of DFAR 252.227-7202-3(a) and its successors, with all use, duplication or disclosure of same being subject to the license and restrictions set forth in this EULA. The U.S. Government's use of the SOFTWARE constitutes acknowledgement of TruLogic's proprietary rights in them. Manufacturer is TruLogic, Inc., 1430 Oak Court, STE 311, Beavercreek, Ohio 45430.

EXCEPT AS EXPRESSLY AUTHORIZED ABOVE, CUSTOMERS SHALL NOT COPY, IN WHOLE OR IN PART, SOFTWARE OR DOCUMENTATION; MODIFY THE SOFTWARE; REVERSE COMPILE OR REVERSE ASSEMBLE ALL OR ANY PORTION OF THE SOFTWARE; OR RENT, LEASE, DISTRIBUTE, SELL, OR CREATE DERIVATIVE WORKS OF THE SOFTWARE.

PROTECTION OF TRADE SECRETS. Customer agrees that aspects of

the licensed materials, including the specific design and structure of individual programs, constitute trade secrets and/or copyrighted material of TruLogic.   Customer agrees not to disclose, provide, or otherwise make available such trade secrets or copyrighted material in any form to any party whose role is outside an Official Use Only capacity without the prior written consent of TruLogic.   Customer agrees to implement reasonable security measures to protect such trade secrets and copyrighted material.   Title to the SOFTWARE shall remain solely with TruLogic.

2008 EULA at p. 2-4.

{¶ 13} After discussing various matters like warranties and indemnification, the EULA further stated that:

BENCHMARK TESTING. You may not disclose the results of any benchmark test using the SOFTWARE to any third party without TruLogic's prior written approval.

RESERVATION OF RIGHTS. TruLogic reserves all rights not expressly granted herein.

LIMITATIONS ON REVERSE ENGINEERING, DECOMPILATION, AND DISASSEMBLY.   You may not reverse engineer, decompile, or disassemble the SOFTWARE, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation.

* * *

NO RENTAL.   You may not rent, lease, or lend the SOFTWARE.

COPYRIGHT STATEMENT.

This SOFTWARE is protected by United States copyright laws and international treaties.

TruLogic, Inc. retains all right, title and interest in and to the SOFTWARE, including the physical layout, fictional operation, graphic art and any other information, manuals or data relating to the SOFTWARE and all rights under any applicable copyrights, patents, trademarks, trade secrets, and other "Proprietary Material" and to all copies you make. Proprietary Material excludes information, technical data, or other viewable content that was rightfully in your possession prior to receipt from us.

Customer-furnished information, technical data, and other viewable content displayed in this product are the property of their respective owners.

You shall not: i) reverse compile, reverse engineer, disassemble or modify the SOFTWARE; ii) use the SOFTWARE to develop, modify or improve a SOFTWARE product; iii) disclose, publish, display or otherwise make available to any persons the Proprietary Material.

Copyright 2000-2008 TruLogic, Incorporated.

TERMINATION. This license is effective until terminated. Customer may terminate this license at any time by destroying all copies of SOFTWARE including any documentation. This license may be terminated by TruLogic for breach of a material term herein if Customer fails to cure such breach after 90 days written notice to the Customer. Upon termination, Customer must destroy all copies of SOFTWARE.

* * *

ENTIRE AGREEMENT. This EULA (including any addendum or amendment to this EULA which is included with the SOFTWARE) is the entire agreement between you and TruLogic relating to the SOFTWARE and the support services (if any) and it supersedes all prior or contemporaneous oral or written communications, proposals and representations with respect to the SOFTWARE or any other subject matter covered by this EULA. To the extent the terms of any TruLogic or programs for support services conflict with the terms of this EULA, the terms of this EULA shall control.

2008 EULA at p. 5-7.

{¶ 14} In 2012, the relationship between TruLogic and GEA for the provision of IETMs ended when GEA instituted a competitive bidding process and engaged another supplier. Complaint at ¶ 22. TruLogic did retain a direct supplier relationship with the USAF, but it incurred substantially diminished revenue from IETM services and products. *Id.* at ¶ 23. Subsequently, in 2018, GEA sent potential suppliers (but not TruLogic) a "Request for Rough Order of Magnitude ("ROM") due to technical flaws in IETM materials being delivered to GEA and its customers, and one of these potential suppliers asked TruLogic for a quote for subcontracted assistance. *Id.* at ¶ 24-25.

{¶ 15} As part of the quote, TruLogic was asked to perform a technical evaluation of the current IETM. During this process, TruLogic learned that GEA was using TruLogic's proprietary mark-up and scripting components in the IETM products, contrary to the terms of the Software Licensing Agreement. *Id.* at ¶ 26-27. In particular, GEA

had distributed the product without the required TruLogic Software Licensing Agreement; had repurposed and reused TruLogic's IETM in a derivative manner; had stripped out TruLogic's copyright notices and company name, while leaving in recognizable thumbprints linked to TruLogic's software; had used TruLogic's artwork; and had used TruLogic's original navigation art, causing the defective GEA derivatives to be mistakenly identified as TruLogic products.   *Id.* at ¶ 28-32.

{¶ 16} According to the Complaint, GEA's improper use had allowed it to acquire sole-source contract awards from the U.S. Government for the USAF and Foreign Military Sales Programs, had caused TruLogic's products to be distributed as "freeware" to GEA's customers as well as TruLogic's direct competitors, and had caused TruLogic to lose contracts.

{¶ 17} On September 15, 2020, TruLogic filed a complaint in the Greene County Common Pleas Court against GEA, alleging the above facts and asserting claims for breach of the Software Licensing Agreement and unjust enrichment.   GEA then filed a motion to dismiss in November 2020, contending that TruLogic's claims were preempted by the U.S. Copyright Act, 17 U.S.C. 301.   In addition, GEA contended that TruLogic had failed to state a claim for either breach of contract or unjust enrichment.   *See* Motion to Dismiss (Nov. 16, 2020).

{¶ 18} After TruLogic responded to the motion, GEA filed a reply in support of its motion to dismiss.   On February 11, 2021, the trial court granted the motion to dismiss, based on a finding that both of TruLogic's claims were preempted by the Copyright Act. TruLogic then timely appealed from the court's decision.

## II. Breach of Contract Claim

{¶ 19} TruLogic's first assignment of error states that:

The Greene County Court of Common Pleas Erred When, in Its February 11, 2021 Judgment Entry Granting Motion to Dismiss, It Granted Defendant's Civ.R. 12(B)(6) Motion to Dismiss Plaintiff's Claim for Breach of Contract on the Ground of Preemption by Federal Copyright Law.

{¶ 20} Under this assignment of error, TruLogic contends that its breach of contract claim should not been deemed to be preempted because a state law breach of contract claim requires extra elements and extra proof beyond what is required for mere copying. TruLogic further argues that the authority the trial court cited represented a minority view and should not have been adopted. *See* TruLogic's Brief, p. 10, discussing *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446 (6th Cir.2001). According to TruLogic, the trial court should have instead followed the "majority approach" exemplified by *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir.1996).

{¶ 21} In response, GEA contends that the Supreme Court of Ohio has already considered this issue, and it requires that the "extra element" in state law claims for breach of contract " 'must change the state law so that it is *qualitatively* different from a copyright infringement claim.' " (Emphasis sic.) GEA's Brief, p. 8, quoting *State v. Perry*, 83 Ohio St.3d 41, 42, 697 N.E.2d 624 (1998). In addition, GEA argues that *ProCD* is not the majority view and that, instead, the majority approach uses a fact-based analysis much like what was done in *Wrench* and *Perry*. *Id.* at p. 14.

{¶ 22} Before addressing these matters, we will briefly discuss our standard of review.

A.   Standard of Review

{¶ 23} The law is well-established that orders granting Civ.R. 12(B)(6) motions to dismiss are subject to de novo review.   *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 5.   De novo review "means that we apply the same standards as the trial court."   (Citations omitted.)   *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.)

{¶ 24} In the context of motions to dismiss, this means that "[i]n construing a complaint upon a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party."   *Mitchell*, 40 Ohio St.3d at 192, 532 N.E.2d 753.   "Then, before we may dismiss the complaint, it must appear beyond doubt that plaintiff can prove no set of facts warranting a recovery."   *Id.*, citing *O'Brien v. Univ. Community Tenants Union*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), syllabus.   Where, as here, documents are attached to or are incorporated into a complaint, we may also consider the documents. *State ex rel. Washington v. D'Apolito*, 156 Ohio St.3d 77, 2018-Ohio-5135, 123 N.E.3d 947, ¶ 10.

{¶ 25} With these points in mind, we will consider the parties' arguments about preemption.

B.   Law Pertaining to Federal Copyright Preemption

{¶ 26} There is no real dispute in the law regarding how to initially analyze preemption claims.   "The federal copyright laws expressly preempt any state law actions which govern 'legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship

that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 * * *.' " *Perry*, 83 Ohio St.3d at 42, 697 N.E.2d 624, quoting 17 U.S.C. 301(a). "The statute thus creates a two-part inquiry: (1) whether a work fixed in a tangible medium of expression is within the subject matter of copyright and (2) whether the rights addressed are equivalent to the exclusive copyright rights set out in Section 106, Title 17, U.S.Code." *Id.*

{¶ 27} *Perry* involved a defendant's appeal of a conviction "based solely upon the unauthorized uploading, downloading, and posting of computer software on a computer bulletin board." *Id.* Concerning the first part of the inquiry, the court noted that under 1980 amendments to the Copyright Act, "computer software is to be treated as a literary work for purposes of the Copyright Act." *Id.* at 45, fn. 2. Therefore, the matter was within the subject matter of copyright. Similarly, the case before us also involves computer software.

{¶ 28} "The second prong of the preemption analysis – the so-called 'equivalency' or 'general scope' requirement – augments the subject matter inquiry by asking whether the state common law or statutory action at issue asserts rights that are the same as those protected under § 106 of the Copyright Act. Under § 301(a), even if appellants' state law claims concern works within the subject matter of copyright, such claims will only be preempted if they assert rights that are 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]' " (Footnote omitted.) *Wrench,* 256 F.3d at 455-456, quoting 17 U.S.C. 301(a).

{¶ 29} The exclusive rights under Section 106 include authors' "exclusive rights to reproduce, prepare derivatives, perform, distribute, and display their work. Thus, 'a right

is equivalent to one of the rights comprised by a copyright if it "is infringed by the mere act of reproduction, performance, distribution or display." ' " *Perry* at 42-43, quoting *Baltimore Orioles, Inc. v. Major League Baseball Players Assn.*, 805 F.2d 663, 677 (7th Cir.1986). (Other citations omitted.)

{¶ 30} "Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights. * * * Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." (Emphasis sic.) *Wrench* at 456. *See also Perry* at 43, quoting *United States ex rel. Berge v. Bd. of Trustees of Univ. of Alabama*, 104 F.3d 1453, 1463 (4th Cir.1997). (Other citation omitted.)

{¶ 31} In *Wrench*, the court found that the plaintiffs' implied contract claim was not preempted because it required an "extra element." In this regard, the court observed that:

> The gist of appellants' state law implied-in-fact contract claim is breach of an actual promise to pay for appellants' creative work. It is not the use of the work alone but the failure to pay for it that violates the contract and gives rise to the right to recover damages. Thus, the state law right is not abridged by an act which in and of itself would infringe one of the exclusive rights granted by § 106, since the right to be paid for the use of the work is not one of those rights.
>
> An extra element is required instead of or in addition to the acts of

reproduction, performance, distribution or display, in order to constitute the state-created cause of action. *The extra element is the promise to pay. This extra element does change the nature of the action so that it is qualitatively different from a copyright infringement claim. The qualitative difference includes the requirement of proof of an enforceable promise and a breach thereof which requires, inter alia, proof of mutual assent and consideration, as well as proof of the value of the work and appellee's use thereof.*

(Emphasis added.)   *Wrench* at 456.

{¶ 32} The court went on to note that:

This qualitative difference is further reflected by the difference in the remedy afforded by the state law claim.   Under Michigan law, a plaintiff's remedy for breach of an implied-in-fact contract includes recovery of the reasonable value of the services rendered, considering factors such as the general practice of the industry. * * *

Under the Copyright Act, remedies for infringement are limited to injunctions; impounding and destruction of infringing articles; recovery of the copyright owner's actual damages and any additional profits of the infringer or statutory damages; and costs and attorneys fees.   *See* 17 U.S.C. §§ 502, 503, 504 and 505. The remedies available under copyright law do not include damages for the reasonable value of the defendants' use of the work.

(Footnotes and citations omitted.)   *Id.* at 456-457.

{¶ 33} As noted, the trial court primarily relied on *Wrench* and *Perry* in concluding that GEA's alleged breach of the Software Licensing Agreement was not qualitatively different from a copyright claim. Judgment at p. 6. The court's decision was based on its conclusion that GEA's acts in modifying or creating a derivative of the TruView software and passing it off as its own did not contain the required "extra element." *Id.*

{¶ 34} Ohio does not have a substantial body of law pertaining to copyright preemption. As the briefs indicate, there are a few Ohio cases. However, before discussing those matters, we will first consider the decision of the Seventh Circuit Court of Appeals in *ProCD* and its status as an alleged majority viewpoint.

## C. *ProCD*

{¶ 35} As a preliminary observation, *ProCD* was decided in 1996, i.e., 25 years ago. *See ProCD*, 86 F.3d at 1447. Quite a few cases have been decided since then, both in the Seventh Circuit and elsewhere.

{¶ 36} *ProCD* involved two issues: (1) whether software purchasers were bound by "shrinkwrap" agreements, which limited the use of the software application and its listings to non-commercial purposes; and (2) whether federal copyright law prohibited enforcement even if the agreements were contracts. *Id.* at 1450. "A shrinkwrap license typically involves (1) notice of a license agreement on product packaging (i.e., the shrinkwrap), (2) presentation of the full license on documents inside the package, and (3) prohibited access to the product without an express indication of acceptance." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428 (2d Cir.2004).

{¶ 37} In *ProCD*, the shrinkwrap agreement was contained inside the software box

rather than on the outside, and the purchaser had no choice "because the software splashed the license on the screen and would not let him proceed without indicating acceptance." *ProCD* at 1452. After reviewing the common law and the Uniform Commercial Code, the court held that such agreements were contracts and were enforceable.

{¶ 38} Shrinkwrap is similar to the term being used here, i.e., "clickwrap" or "click thru." "Clickwrap is a commonly used term for agreements requiring a computer user to 'consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with [a] ... transaction.' " *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir.2012), quoting *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa.2007). Generally, courts have upheld clickwrap agreements. *Id.*

{¶ 39} In discussing the second issue in *ProCD*, i.e., preemption, the Seventh Circuit Court of Appeals first noted that three courts of appeal had said that rights created by contract are not " 'equivalent to any of the exclusive rights within the general scope of copyright.' " *ProCD* at 1454, quoting 17 U.S.C. 301(a), and citing *National Car Rental Sys., Inc. v. Computer Assocs. Internatl., Inc.*, 991 F.2d 426, 433 (8th Cir.1993), *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.1990), and *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988). The Seventh Circuit found these decisions sound, stressing that:

> Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established by law – rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or

perform the work gets permission; silence means a ban on copying. A copyright is a right against the world.  Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."

*ProCD* at 1454.

{¶ 40} The Seventh Circuit Court of Appeals then commented that "[a]lthough Congress possesses power to preempt even the enforcement of contracts about intellectual property * * * – courts usually read preemption clauses to leave private contracts unaffected."  *Id*. at 1454.   The court also analogized Section 301(a) to a federal statute dealing with transportation, stating that:

> * * * *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), provides a nice illustration.  A federal statute preempts any state "law, rule, regulation, standard, or other provision ... relating to rates, routes, or services of any air carrier."  49 U.S.C.App. § 1305(a)(1).  Does such a law preempt the law of contracts – so that, for example, an air carrier need not honor a quoted price (or a contract to reduce the price by the value of frequent flyer miles)?  The Court allowed that it is possible to read the statute that broadly but thought such an interpretation would make little sense.  Terms and conditions offered by contract reflect private ordering, essential to the efficient functioning of markets.  513 U.S. at [219], 115 S.Ct. at 824-25.  Although some principles that carry the name of contract law are designed to defeat rather than implement consensual transactions, *id.* at — n. 8, 115 S.Ct. at 826 n.

8, the rules that respect private choice are not preempted by a clause such as § 1305(a)(1). Section 301(a) plays a role similar to § 1301(a)(1): it prevents states from substituting their own regulatory systems for those of the national government. Just as § 301(a) does not itself interfere with private transactions in intellectual property, so it does not prevent states from respecting those transactions. Like the Supreme Court in *Wolens*, we think it prudent to refrain from adopting a rule that anything with the label "contract" is necessarily outside the preemption clause: the variations and possibilities are too numerous to foresee. *National Car Rental* [, 991 F.2d 426,] likewise recognizes the possibility that some applications of the law of contract could interfere with the attainment of national objectives and therefore come within the domain of § 301(a). But general enforcement of shrinkwrap licenses of the kind before us does not create such interference.

*ProCD* at 1454-1455.

{¶ 41} Finally, *ProCD* also discussed *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), which had held that "promises to pay for intellectual property may be enforced even though federal law (in *Aronson*, the patent law) offers no protection against third-party uses of that property." *ProCD* at 1454. Concerning that case, the court noted that:

*Aronson* emphasized that enforcement of the contract between Aronson and Quick Point Pencil Company would not withdraw any information from the public domain. That is equally true of the contract between ProCD and Zeidenberg. Everyone remains free to copy and

disseminate all 3,000 telephone books that have been incorporated into ProCD's database. Anyone can add SIC codes and zip codes. ProCD's rivals have done so. Enforcement of the shrinkwrap license may even make information more readily available, by reducing the price ProCD charges to consumer buyers. To the extent licenses facilitate distribution of object code while concealing the source code (the point of a clause forbidding disassembly), they serve the same procompetitive functions as does the law of trade secrets. *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 925 F.2d 174, 180 (7th Cir.1991). Licenses may have other benefits for consumers: many licenses permit users to make extra copies, to use the software on multiple computers, even to incorporate the software into the user's products. But whether a particular license is generous or restrictive, a simple two-party contract is not "equivalent to any of the exclusive rights within the general scope of copyright" and therefore may be enforced.

*ProCD* at 1455.


## D. Further Interpretations of *ProCD*

**{¶ 42}** As to subsequent interpretation of *ProCD*, TruLogic is correct in that a majority of federal courts, even *Wrench*, accept its basic premise, although some reservations do exist. *E.g.*, *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1324-1325 (Fed. Cir.2003) (applying what it believes would be the First Circuit's view and rejecting preemption); *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424,

430-433 (2d Cir.2012) (rejecting preemption where contract was implied in fact and there was a promise to pay); *Acorn Structures*, 846 F.2d at 923 [4th Cir.] (action was based on implicit provision in contract and did not arise out of copyright subject matter); *Taquino*, 893 F.2d at 1501 [5th Cir.]; *Real Estate Innovations, Inc. v. Houston Assn. of Realtors, Inc.*, 422 Fed.Appx. 344, 349 (5th Cir.2011); *Natl. Car Rental Sys., Inc.*, 991 F.2d at 432-434 [8th Cir.]; *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-1090 (9th Cir.2005) ("[a] state law tort claim concerning the unauthorized use of the software's end-product is not within the rights protected by the federal Copyright Act"); *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1318-1319 (11th Cir.2001) ("courts generally read preemption clauses to leave private contracts unaffected"); *Utopia Provider Systems, Inc. v. Pro-Med Clinical Systems, L.L.C.*, 596 F.3d 1313, 1326-1327 (11th Cir.2010) (software license agreement is "extra element" in breach of contract case, thereby avoiding preemption).

**{¶ 43}** To the extent that *ProCD* has "been taken by some to hold that any contract supplies the necessary 'extra element,' * * * [other] courts * * * have rejected the view that *ProCD* stands for the universal proposition 'that no breach of contract action would ever be barred by § 301 [of the Copyright Act].' " *Green v. Hendrickson Publishers, Inc.*, 770 N.E.2d 784, 789 (Ind.2002), citing *Ballas v. Tedesco*, 41 F.Supp.2d 531, 536-37, n. 14 (D.N.J.1999) (agreeing with courts rejecting the broad view).

**{¶ 44}** In *Green*, the Indiana Supreme Court also stressed that "to the extent *ProCD* suggests that no state contract claim is preempted, that decision has met with harsh criticism. As one leading commentator on copyright has noted, *ProCD* relied on three other cases, each involving contract rights significantly broader than the simple

promise not to reproduce. Accordingly, 'none supports the broad conclusion that the Seventh Circuit ascribes to them.' " *Id.* at 789-790, quoting 1 Nimmer, *Nimmer on Copyright*, Section 1.01[B] [1][a], at 1-20. Thus, " 'pre-emption should continue to strike down claims that, though denominated "contract," nonetheless complain directly about the reproduction of expressive materials.' " *Id.* at 790, quoting Nimmer at 1-22. *See also Canal+ Image UK Ltd. v. Lutvak*, 773 F.Supp.2d 419, 445 (S.D.N.Y.2011) (commenting that "the *ProCD* decision does not go nearly as far as courts in this district have taken it. For one, the Seventh Circuit found 'it prudent to refrain from adopting a rule that anything with the label "contract" is necessarily outside the preemption clause: the variations and possibilities are too numerous to foresee' ").

{¶ 45} Similarly, while the Sixth Circuit Court of Appeals agrees with the general premise about contract claims, it has rejected the idea that "all state law contract claims survive preemption simply because they involve the additional element of promise." *Wrench*, 256 F.3d at 457, citing *ProCD*, 86 F.3d at 1454 and *Taquino*, 893 F.2d at 1501. In this vein, the court stressed that "[u]nder that rationale, a contract which consisted only of a promise not to reproduce the copyrighted work would survive preemption even though it was limited to one of the exclusive rights enumerated in 17 U.S.C. § 106. If the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted. * * * As the authors note in 1 Nimmer on Copyright § 1.01[B][1][a] at 1-22: 'Although the vast majority of contract claims will presumably survive scrutiny ... nonetheless pre-emption should continue to strike down claims that, though denominated "contract," nonetheless complain directly about the reproduction of expressive materials.' " *Wrench* at 457-58.

**{¶ 46}** The Second Circuit Court of Appeals has also stressed its recognition that " 'preemption cannot be avoided simply by labeling a claim "breach of contract." ' " *Universal Instruments Corp. v. Micro Systems Eng., Inc.*, 924 F.3d 32, 48-49 (2d Cir. 2019), quoting *Forest Park*, 683 F.3d at 432. (Other citation omitted.) In this regard, the court commented that it had previously rejected preemption in *Forest Park* because the contract included "an 'extra element' of a promise to pay, and plaintiff sought contract damages when defendant used plaintiff's copyrighted work without paying for the privilege." *Id.* at 49, citing *Forest Park* at 428. In contrast, in the case before it, there was no dispute about payment, and the plaintiff did not argue that the defendants violated an equipment purchase agreement by failing to pay for using the intellectual property. *Id.* The remaining part of the contract claim involved rights exclusive under the Copyright Act, and "vindication of an exclusive right under the Copyright Act, read into a license by negative implication" was preempted. *Id.*

**{¶ 47}** Having extensively read and analyzed federal law on this subject, we conclude that the law pertaining to preemption of breach of contract claims is neither as narrow as GEA claims nor as forgiving as TruLogic asserts. We agree with TruLogic that the majority of federal circuits have generally found that breach of contract claims are not preempted under the Copyright Act. However, we also agree with GEA that blanket refusal of preemption is not appropriate and that attention to facts is important. We do note that even in *Wrench*, the court did not preempt the claim where an extra element (implied-in-fact contract with promise to pay) was at issue. *Wrench*, 256 F.3d at 456-57.

## C. Ohio Law

{¶ **48**} As indicated, the Supreme Court of Ohio did discuss preemption in *Perry*, 83 Ohio St.3d 41, 697 N.E.2d 624. Ohio cases both before and after *Perry* are sparse, both in number and discussion. We have reviewed all the Ohio cases on this subject that the parties cited, as well as any cases we could find.

{¶ **49**} The first case we will discuss is *State v. Moning*, 1st Dist. Hamilton No. C-010315, 2002-Ohio-5097. *Moning*, like *Perry*, involved a criminal prosecution, and the defendant there claimed his conviction on a charge of unauthorized use of a computer was preempted. *Id*. at ¶ 3-4 and 6. Citing *Perry*, and without any particular analysis, the court found that "[t]he element of obtaining access to the computer and the RCIC database in violation of the rules and restrictions, and thus beyond the consent of the owner or other person authorized to give consent, is sufficient to satisfy the extra element test and except the unauthorized-use-of property charge from the express preemption clause in the Copyright Act." *Id*. at ¶ 13.

{¶ **50**} Another decision of the First District Court of Appeals dealt with a dismissal of a claim for lack of personal jurisdiction. *See N. Am. Software, Inc. v. James I. Black & Co.*, 1st Dist. Hamilton No. C-100696, 2011-Ohio-3376, ¶ 1 (affirming dismissal based on lack of personal jurisdiction). Before discussing personal jurisdiction, the court briefly considered whether the case was subject to dismissal based on preemption. The claims in question involved a "clickwrap" software agreement and the defendant's alleged failure to pay after clicking on the agreement and agreeing to pay. *Id*. at ¶ 4-6. Again, without much discussion of the law, the court found that some of the plaintiff's claims "at least insofar as they seek to enforce a promise to pay, contain an 'extra element,' and, therefore, do not fall within the exclusive jurisdiction of the federal courts." *Id*. at ¶ 10

and fn. 6, citing *Wrench*, 256 F.3d at 456.

{¶ 51} In a third case from the same district, which involved an oral contract, the court again reached its decision (this time that the claims were preempted), based on minimal analysis. *Krapp v. McCarthy*, 121 Ohio App.3d 64, 67-68, 698 N.E.2d 1049 (1st Dist.1997).

{¶ 52} In *McCants v. Tolliver*, 9th Dist. Summit No. 27253, 2014-Ohio-3478, the court considered whether the plaintiff's contract claims against a co-author and a performer of a song were preempted. *Id.* at ¶ 1-6. In that case, the plaintiff and the other parties allegedly entered into an oral agreement that if the song made money, they would share equally in the proceeds. *Id.* at ¶ 13. Again, without extensive discussion of preemption, the court held that the claim was not preempted, because "[t]he alleged promise to split the proceeds [was] 'qualitatively different' than that of a copyright infringement claim" and satisfied the "extra element" requirement. *Id.* at ¶ 13.

{¶ 53} The final Ohio case addressing preemption is again from the First District. *See First World Architects Studio, PSC v. McGhee*, 2018-Ohio-2158, 114 N.E.3d 654 (1st Dist.). In that case, First World alleged that the defendants had made unauthorized use of copyrighted architectural drawings in seeking to obtain a building permit. *Id.* at ¶ 2. First World also attached a copy of a contract with one defendant to the complaint, but did not make claims against any defendant in connection with the contract. *Id.* Again, after citing the pertinent tests for copyright preemption, the court simply concluded, without analysis, that the complaint was preempted because the plaintiff did not make any allegations concerning a breach of contract. *Id.* at ¶ 10-12.

{¶ 54} The few lower level decisions are of little assistance here, as they involve

quite straightforward situations that do not require much analysis. Furthermore, to the extent that these cases discuss an agreement to pay, that is not pertinent here, because GEA's EULA did not contain such a promise. To the contrary, the EULA indicated that it was a "perpetual, fully paid-up license." 2008 EULA at p. 2. While the reference to past consideration might prove fatal if such a promise were the only basis of an "extra element," that is not true here.

{¶ 55} Our review of *Perry* indicates that the Supreme Court of Ohio may find a lack of preemption where a software licensing agreement exists. As indicated, the court held in *Perry* that criminal charges of unauthorized use against the defendant were preempted because they involved uploading and downloading, and distribution, and were not qualitatively different from matters covered by the Copyright Act. *Perry*, 83 Ohio St.3d at 45-46, 697 N.E.2d 624.

{¶ 56} Although the State attempted to argue in *Perry* that violating a licensing agreement involves an "extra element," the majority refused to consider this issue because there was no evidence of an agreement in the record. *Id.* Three members of the court dissented, arguing, first, that software licenses are virtually automatic when software is sold and that the defendant's no contest plea was an admission that he had "used software belonging to Microsoft and/or Clark Development Corporation without consent of the owner or person authorized to give consent." *Id.* at 51-52 (Lundberg Stratton, J., dissenting).

{¶ 57} The dissent further argued that:

A licensing agreement deals with the relationship between parties and defines the authorized use of a software package. *See, e.g., Bourne v.*

*Walt Disney Co.* (C.A.2, 1995), 68 F.3d 621. Determining whether use of computer software is authorized involves an analysis of the licensing/user agreement rather than copyright law. *Natl. Car Rental Sys., Inc. v. Computer Assoc. Internatl., Inc.* (C.A.8, 1993), 991 F.2d 426, 431. Limitations on use must be determined from the licensing agreement, not copyright law. *Id.* at 432. Therefore, enforcement of a licensing agreement is qualitatively different so as to preclude preemption by federal copyright law. *ProCD, Inc. v. Zeidenberg* (C.A.7, 1996), 86 F.3d 1447.

*Perry* at 52 (Lundberg Stratton, J., dissenting).

{¶ 58} In responding to these points, the majority observed that:

The dissent concedes that no licensing agreement was admitted into evidence, yet bases its argument on a violation of this phantom agreement, saying that "issuance of a licensing or contractual agreement with commercially sold software is *virtually* automatic." (Emphasis added.) In essence, the dissent takes judicial notice of the likelihood that a licensing agreement accompanied the software, and despite the state's failure to introduce this admittedly essential piece of evidence, would find the likelihood of its existence sufficient to prove guilt beyond a reasonable doubt in this criminal case.

Even if the court could take judicial notice of the existence of such an agreement for the first time, on appeal, in a criminal case, we would not know the terms of that agreement and, therefore, would not be able to determine whether the agreement extended beyond the scope of copyright

protections or whether it was violated.

The dissent asserts that Perry's no contest plea establishes, as admitted fact, that a licensing agreement existed, applied to Perry, was violated by Perry, and included uses beyond those protected by copyright law. This assertion is unfounded. Perry's plea is an admission to some type of unauthorized use. However, it is not an admission that he, without authorization, used the software in every conceivable way. The state had every opportunity to clarify what unauthorized uses were the bases for the indictment. Perry requested a bill of particulars setting forth the specific and detailed conduct that was alleged to constitute the offenses described in the indictment, but no response and no such bill of particulars appear in the record. Reproduction, distribution, and display, uploading, posting, and downloading are all "uses" of the software. They are the uses alleged by the state and are all exclusively governed by copyright law.

Further, a consumer software licensing agreement is generally treated as a contract between the copyright owner or "seller" of the software and the licensee or "buyer" and is therefore governed by general contract law and the U.C.C. *See ProCD, Inc. v. Zeidenberg* (C.A.7, 1996), 86 F.3d 1447; Ballon, The Emerging Law of the Internet (1997) 507; Practicing Law Institute – Patents 1163, at 1247. There can be legal differences between licenses and sales contracts that affect the parties' rights under the copyright doctrine of first sale, but these differences are not implicated in this case. Accordingly, in the context of this case, licenses are treated as

general contracts. *See ProCD*; Emerging Law of the Internet, at 1247. What is important to this discussion is the fact that third-party users, whether authorized or unauthorized, are not parties to the licensing agreement and generally cannot be bound by its terms. *Copyrights are rights "against the world," but a licensing agreement affects only its parties and, as such, any licensing agreement involving the software would be between the copyright owner and the purchaser.* As the state originally brought theft charges against Perry, it contended that Perry did not purchase the software. Both the plea hearing transcript and the sentencing hearing transcript also reflect the state's theory that the software found in Perry's home was not purchased. Therefore, any licensing terms that did exist would not apply to Perry.

(Emphasis added.) *Perry*, 83 Ohio St.3d at 46-47, 697 N.E.2d 624.

{¶ 59} In light of the above statements, we conclude that the Supreme Court of Ohio would agree that software licensing agreements may appropriately be treated as distinct from copyrights, and enforcement may not be preempted under the Copyright Act. In particular, the majority in *Perry* distinguished between situations where a third party is not subject to the licensing terms and cases where, as here, the parties are subject to the licensing agreement. We are not stating that preemption is unwarranted in all or even many cases; we are simply indicating that such agreements can involve different considerations than those that arise under the Copyright Act and that *Perry* is not a barrier to finding a lack of preemption.

### C. How to Analyze the Contract Claims

{¶ 60} Another difference in opinion exists concerning how the contract claim in question should be analyzed. Some courts hold that "the focus * * * is not on the 'conduct' or 'facts pled,' but on the 'elements' of the causes of action." *Tire Eng. & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 309-310 (4th Cir.2012), quoting *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir.1993). *See also Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1543 (10th Cir.1996) (noting that the comparison is to "the elements of the causes of action, not the facts pled to prove them"). In contrast, the Fifth Circuit Court of Appeals considers both the elements of a particular cause of action as well as the conduct that is actually alleged. *See Carson v. Dynegy, Inc.*, 344 F.3d 446, 456-457 (5th Cir.2003).

{¶ 61} After reviewing *Perry*, we conclude that the Supreme Court of Ohio would consider both the facts alleged and the elements of the cause of action. Specifically, in *Perry*, the majority looked at the elements of the crime, the facts alleged in the indictment, and the transcript of the plea hearing. *Perry*, 83 Ohio St.3d at 43-44, 48-49, 697 N.E.2d 624. This makes sense, particularly in the context of a motion to dismiss, because otherwise a party could simply allege the elements of breach of contract and escape preemption.

{¶ 62} In the case before us, the complaint alleged a number of breaches of the 2008 EULA, some of which related to matters covered by the Copyright Act, and others that did not. For example, the complaint alleged, among other things, improper use of proprietary TruLogic markup and scripting components; repurposing and reusing code and templates; stripping out code and creating derivative products (implicating reverse

engineering), failing to include TruLogic's logos, end user license agreement, and trademarks as required by the EULA, using components to develop and improve competitive products, and creating a mistaken impression that TruLogic was involved in a defective product, thereby damaging TruLogic's reputation.

{¶ 63} As indicated, among the exclusive rights under 17 U.S.C. 106 is authorization of the preparation of "derivative works based upon the copyrighted material." 17 U.S.C. 106(2). "Under the Copyright Code, 17 U.S.C.§ 101, a derivative work is work 'based upon one or more preexisting works' and includes any recasting, transforming or adopting of the original work." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 212, fn. 9 (3d Cir.2002), quoting 17 U.S.C. 101, and citing *Whelan Assocs., Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1239 (3d Cir.1986). From that perspective, repurposing templates could be considered creating a derivative work, but other matters included in the allegations could not. The EULA certainly restricted the use of TruLogic's software in a number of other ways, including prohibiting reverse engineering.

{¶ 64} Federal courts interpreting EULAs have held that a contractual restriction on use of software " 'constitutes an extra element that makes this cause of action qualitatively different from one for copyright.' " *Davidson & Assocs., Inc. v. Internet Gateway, Inc.*, 334 F.Supp.2d 1164, 1175 (E.D.Mo.2004), *aff'd*, 422 F.3d 630 (8th Cir.2005), quoting *Natl. Car Rental Sys., Inc.*, 991 F.2d at 433. During the subsequent appeal in *Davidson*, the Eighth Circuit Court of Appeals held that the lower court properly granted summary judgment in the plaintiffs' favor, because by signing the EULA and a terms of use agreement, the defendants "expressly relinquished their rights to reverse

engineer." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 639 (8th Cir.2005).

**{¶ 65}** Similarly, in *Micro Focus (US), Inc. v. Genesys Software Sys., Inc.*, D. Mass, Civil Action No. 14-14049-NMG, 2015 WL 1523606 (Apr.3, 2015), the district court held that breach of contract claims based on the EULA "require the extra element of unauthorized use of the software's end-product beyond the required elements for stating a copyright infringement claim." *Id.* at *3, citing *Altera*, 424 F.3d at 1089. *See also Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 426 F.Supp.2d 1101, 1108-1109 (E.D.Cal.2006) ("[r]everse engineering is not within the scope of the exclusive rights of copyright"); and *Out of the Box Developers, LLC v. LogicBit Corp.*, N.C. Super. Ct. No. 10 CVS 8327, 2012 WL 5356282, *8-11 (Oct. 30, 2012) (claim of reverse engineering contains "extra element" and is not preempted where defendant was alleged to have copied copyrighted material into competitive product for purpose of competing with plaintiff).

**{¶ 66}** Based on the preceding discussion, we conclude that the trial court erred in granting the motion to dismiss with respect to TruLogic's breach of contract claim. We express no opinion on the merits of the litigation, but simply indicate that dismissal of the breach of contract claim was erroneous. Accordingly, the first assignment of error is sustained. The judgment on this claim will be reversed and the case will be remanded for further hearing.

## II.  Unjust Enrichment

**{¶ 67}** TruLogic's second assignment of error states that:

> The Greene County Court of Common Pleas Erred When, in Its

February 11, 2021 Judgment Entry Granting Motion to Dismiss, It Granted Defendant's Civ.R. 12(B)(6) Motion to Dismiss Plaintiff's Claim for Unjust Enrichment on the Grounds of Preemption by Federal Copyright Law.

{¶ 68} Under this assignment or error, TruLogic acknowledges that federal courts generally preempt unjust enrichment claims. TruLogic's Brief at p. 17. Nonetheless, TruLogic contends that the claim here goes beyond reproduction and use and involves matters like GEA's failure to attribute the software to TruLogic and GEA's failure to include a copy of TruLogic's license with its product. The trial court did not specifically discuss unjust enrichment, other than stating that both the contract and unjust enrichment claims lacked an extra element that made them "qualitatively different than a copyright infringement claim." Judgment at p. 6.

{¶ 69} "In Ohio, unjust enrichment is a claim under quasi-contract law against a person in receipt of benefits that he is not justly and equitably entitled to retain." *Crawford v. Hawes*, 2013-Ohio-3173, 995 N.E.2d 966, ¶ 34 (2d Dist.), citing *Hummel v. Hummel,* 133 Ohio St. 520, 527, 14 N.E.2d 923 (1938). The elements of this claim are: " '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment').' " *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984), quoting *Hambleton v. R. G. Barry Corp.*, 10th Dist. Franklin No. 82AP-1021, 1983 WL 3673, *4 (Aug. 10, 1993).

{¶ 70} As a general rule, unjust enrichment claims are preempted by the Copyright Act. *E.g., Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306-307 (2d Cir. 2004) (applying New York law); *Natl. Car Rental Sys., Inc.*, 991 F.2d at 435. The

rationale is that while implied-in-fact contracts can avoid preemption, implied-in-law agreements based on matters like quasi-contract or unjust enrichment do not require allegations of actual agreements between parties. *Forest Park Pictures*, 683 F.3d at 432. *See also Murray Hill Publications, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 638 (6th Cir.2001), *abrogated on other grounds, Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010).

**{¶ 71}** Some courts have held that "[a] claim for unjust enrichment may not be preempted, however, if the plaintiff can show that 'material beyond copyright protection' formed the basis of the unjust enrichment." *WJ Global LLC v. Farrell*, 941 F.Supp.2d 688, 693 (E.D.N.C.2013), quoting *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F.Supp.2d 533, 537 (E.D.Va.2005).

**{¶ 72}** In *Natl. Car Rental Sys., Inc.*, the Eighth Circuit Court of Appeals also concluded that a claim for unjust enrichment was not preempted. In reaching this conclusion, the court stated that:

> We do not read CA [Computer Associates International] to allege that National was unjustly enriched as a result of a wrongful exercise of one of the § 106 rights. Rather, we read this allegation of damage as a further explanation of the damages CA intends to prove arising from the breach of contract. CA alleges generally that it has been damaged in an amount to be proved at trial, and it will have to prove those damages. In this context, we read its allegations of unjust enrichment as an attempt, albeit inartful, to allege that National received from Lend Lease and Tilden amounts that CA would have received had National not breached their contract. Second,

National notes that CA requested return or destruction of any copies of its programs still in National's possession. It notes that the Copyright Act provides precisely that remedy, *see* 17 U.S.C. § 504, and claims that the request for destruction shows the claim is equivalent to a copyright claim. We disagree. The parties' contract specifically provides for the return or destruction of the licensed programs upon any breach of the license agreement. This remedy would apply equally to this asserted breach (improper use) as to an action for breach of an agreement to pay royalties or license fees, which National admits would not be preempted. Furthermore, the copyright remedy of return or destruction applies even absent a preexisting relationship between the parties: it does not have to be stated in a contract or license agreement. We cannot conclude that this action is preempted simply because the parties' contract provides a remedy for breach identical to a remedy provided in copyright.

(Footnote omitted.) *Natl. Car Rental Sys., Inc.*, 991 F.2d at 435. The fact that a claim has been poorly phrased and actually pertains to another subject is not a basis for deviating from the general rule.

{¶ 73} In *Tastefully Simple, Inc. v. Two Sisters Gourmet, L.L.C.*, 134 Fed.Appx. 1 (6rh Cir.2005), the Sixth Circuit Court of Appeals found that while some parts of the plaintiff's unjust enrichment claim were not barred by preemption, the claim was still barred because "Michigan law will not imply a contract where there is a contract covering the same subject matter." *Id.* at 6, fn. 3, citing *Barber v. SMH*, 202 Mich.App. 366, 509 N.W.2d 791 (1993). Ohio follows the same principle. *See Hughes v. Oberholtzer*, 162

Ohio St. 330, 335, 123 N.E.2d 393 (1954) (noting the general principle that there cannot "be an express agreement and an implied contract for the same thing existing at the same time").

{¶ 74} We are aware that "Civ.R. 8(E) (2) permits alternative or hypothetical pleading, or even the use of inconsistent claims." *Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88, 92, 326 N.E.2d 267 (1975). TruLogic, therefore, could have pled unjust enrichment as an alternative remedy even where an express contract existed. And, in fact, TruLogic points out in its brief that it pled unjust enrichment as an alternate theory. TruLogic Brief at p. 17, fn. 1.

{¶ 75} We need not resolve the issue of whether TruLogic could maintain its unjust enrichment claim despite the general preemption of such claims. As noted, TruLogic argues that its unjust enrichment claim is based on matters like GEA's failure to attribute the software to TruLogic and GEA's failure to include a copy of TruLogic's license with its product. However, these are precisely the same claims that have been asserted concerning the EULA, an express written agreement. As a logical matter, there cannot be any claim for unjust enrichment because the written contract covers the same matter.

{¶ 76} Further, TruLogic's EULA states that it is "the entire agreement between you [GEA] and TruLogic relating to the SOFTWARE and the support services (if any) and it supersedes all prior of contemporaneous oral or written communications, proposals and representations with respect to the SOFTWARE or any other subject matter covered by this EULA." 2008 EULA at p. 6-7. Given this statement, we cannot see how a claim for unjust enrichment could also exist. Accordingly, while our analysis differs from that of the trial court, we agree that the unjust enrichment claim was properly dismissed.

{¶ 77} As a final matter, even if we had to decide the matter, we would conclude, based on the general authority, that the unjust enrichment claim would be preempted. TruLogic's argument that this claim should be retained is very brief and does not discuss the rationale for distinguishing contracts implied in law from express contract claims. As indicated, a contract implied in law does not contain an actual promise by the side against whom the claims are asserted. Such promises can provide the "extra element" required for avoiding preemption.

{¶ 78} Based on the preceding discussion, the second assignment of error is overruled.

## IV.   Conclusion

{¶ 79} TruLogic's first assignment of error having been sustained and its second assignment having been overruled, the judgment of the trial court is reversed in part and affirmed in part. This matter is remanded to the trial court for further proceedings.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

D. Jeffrey Ireland
Brian D. Wright
Donald E. Burton
April L. Besl
Jaci L. Overmann
Hon. Michael A. Buckwalter